EXHIBIT  B

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF ALASKA AT ANCHORAGE
3    _____

                                              )
4    JOE W. WILLIAMS,                         )
                                              )
5              Plaintiff,                     )
                                              )
6         vs.                                 )
                                              )
7    FEDEX GROUND PACKAGE SYSTEMS,            )
     INC., an Alaska corporation,            )
8                                             )
               Defendant.                     )
9    _____)

     Case No. A05-0192 CV (JKS)
10
11
12


13   _____

            DEPOSITION OF JOE WADE WILLIAMS
14   _____
15
16           Pages 1 - 236, Inclusive
17           Monday, April 3, 2006,
18                 9:13 a.m.
19
20
21        Taken by Counsel for the Defendant
                          at
22        Tindall Bennett & Shoup, PC
          508 W. 2nd Avenue, 3rd Floor
23          Anchorage, Alaska  99501
24
25

WILLIAMS v. FEDEX

Page 2

1                A-P-P-E-A-R-A-N-C-E-S
2
   For the Plaintiff:
3
       Isaac D. Zorea and Moshe C. Zorea
4      MOSHE CALBERG ZOREA & ASSOCIATES
       7540 E. 17th Avenue
5      Anchorage, Alaska  99504
       (907) 337-7741
6
7
   For the Defendant:
8
       Katheryn Bradley
9      JACKSON LEWIS LLP
       One Union Square
10     600 University Street, Suite 2900
       Seattle, Washington 98101
11     (206) 626-6405
12
   Also present:  Steven Mondragon
13
14 Court Reporter:
15     Gail Ruth Peckham, RPR
       Registered Professional Reporter
16     PACIFIC RIM REPORTING
       711 M Street, Suite 4
17     Anchorage, Alaska  99501
       (907) 272-4383
18
19
20
21
22
23
24
25

Page 3

1                              I-N-D-E-X
2
3
EXAMINATION BY                                    PAGE
4
          Ms. Bradley                              6
5         Mr. Isaac Zorea                         214
6
FURTHER EXAMINATION BY
7
          Ms. Bradley                             229
8         Mr. Isaac Zorea                         233
9
10
THOMPSON EXHIBITS REFERENCED
11
     10   Composite: Memorandum to TM/ANAK - 995   109
12        from Carol Dubbs 03/25/02 Subject: Approval
          Supplemental Van; with attachments. (4 pgs.)
13
     11   FedEx Ground, Inc. CONTRACTOR EMPLOYMENT/   97
14        BUSINESS REFERENCE QUESTIONNAIRE AND
          ALCOHOL AND DRUG TEST VERIFICATION re Joe
15        W. Williams (1 pg.)
16
     12   FedEx Ground RECORD OF ROAD TEST (SAFETY    40
17        RIDE) re Joe Williams (3 pgs.)
18
     16   CONTRACTOR'S DRIVER/TEMPORARY DRIVER       156
19        TERMINATION NOTICE Date 10/14/02; with
          e-mail to Laura Forsmark from Nicole
20        Gilmore 10/15/2002. (1 pg.)
21
EXHIBITS
22
     18   POMERANTZ STAFFING SERVICES, LLC           35
23        CONFIDENTIAL EMPLOYEE APPLICATION
          dated 01/31/2002 re Joe W Williams (1 pg.)
24
     19   ACKNOWLEDGMENT OF TEMPORARY ASSIGNMENT     36
25        dated 01/31/02 re Joe W. Williams (1 pg.)

Page 4

1   EXHIBITS CONTINUED
2

3  20    RESPONSIBILITY PROGRAM dated 01/31/02    36
          re Joe W Williams (1 pg.)
4

5  21    Composite: 2000 JWW Trucking Invoices    55
          (32 pgs.)
6

  22    THOMPSON & ASSOCIATES payment statements    55
7        Paid To: JWW TRUCKING (26 pgs.)
8

  23    WELLS FARGO Bank Statements Acct. #201-    55
9        6987265 2001 (5 pgs.)
10

  24    WELLS FARGO Bank Statements Acct. #201-    55
11      6987265 2002 (14 pgs.)
12

  25    SUBCONTRACTOR ENROLLMENT FORM for Group    99
13      Independent Contractor Work Accident
          Insurance Policy No: 1A000001 re John
14      Thompson/Joe W. Williams (1 pg.)
15

  26    CONTRACTOR/DRIVER INFORMATION SHEET dated    168
16      12/14/00 re Joe W Williams (4 pg.)
17

  27    COMPLAINT AMENDED Case No. 3AN-04-11527 CI    173
18      (10 pgs.)
19

  28    Form 1040 2002 Joseph W Williams 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 193
20      (10 pgs.)
21

  29    Form 1040 2003 Joseph W Williams 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 193
22      (8 pgs.)
23

  30    Form 1040 2004 Joseph W Williams 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 193
24      (11 pgs.)
25

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 5

1    EXHIBITS CONTINUED

2

      31     INITIAL DISCLOSURES BY JOE W. WILLIAMS          202
3             Case No. 3AN-04-11527 CI (2 pgs.)

4

      32     DEFENDANT FEDEX GROUND PACKAGE SYSTEM           202
5             INC.'S FIRST REQUESTS FOR ADMISSION
              Case No. 3AN-04-11527 CI (7 pgs.)

6

      33     DEFENDANT FEDEX GROUND PACKAGE SYSTEM           202
7             INC.'S INTERROGATORIES NOS. 1-9
              Case No. 3AN-04-11527 CI (13 pgs.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WILLIAMS v. FEDEX                                                    JOE WILLIAMS
                                                                    4/3/2006

Page 6

```
 1              ANCHORAGE, ALASKA, MONDAY, APRIL 3, 2006

 2                          9:13 A.M.

 3                            -oOo-

 4                    JOE WADE WILLIAMS,

 5          Deponent herein, having been duly sworn,

 6            was examined and testified as follows:

 7                         EXAMINATION

 8    BY MS. BRADLEY:

 9        Q.   Mr. Williams, I don't know that we

10    officially met.  But I'm Katheryn Bradley, and I'm

11    the attorney for FedEx Ground in this case.

12             And I know you were here at the deposition

13    on Friday of Mr. Thompson.  Was that the first time

14    you've participated in a deposition?

15        A.   Yeah, never seen one.  I was kind of

16    confused, and at least now I've seen a little bit of

17    the questions.

18        Q.   Okay.  So you know that the way it works, I

19    ask the questions, and then I'll expect you to give

20    me your best answer?

21        A.   Yeah.

22        Q.   And you understand that you're under oath

23    this morning?

24        A.   Yes, I do.

25        Q.   All right.  And do you understand that my
```

WILLIAMS v. FEDEX

Page 18

1    the relationship between FedEx Ground and the carrier

2    that does the Fairbanks run?

3         A.    No idea, other than they used them to take

4    the freight up there.  Other than that, I have no

5    idea.

6         Q.    So you don't know what kind of contractual

7    arrangement they have?

8         A.    No, I do not.

9         Q.    You don't know, for instance, if it is a

10   subcontract, do you?

11        A.    No, no.

12        Q.    You mentioned a moment ago that when --

13   towards the end of your time driving for John

14   Thompson that you spoke with Peter Ricks and a person

15   you believe was Tom Brasch about whether you could --

16   Peter could make something a route?

17        A.    Yeah.  The shuttle run, at the whole time

18   Peter told me I was working for him, so it did not

19   matter what John thought; he could turn it into his

20   own route, give me the route, but it was such a small

21   amount that the company did not like that.  So he

22   said if I just stayed working, I would continue to

23   deliver it until he could get the Fairbanks run

24   approved, and we could work on an agreement, and I

25   could just go to a different size truck and start

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 19

1    going to Fairbanks.

2        Q.   Now, I'm trying to understand,

3    Mr. Williams, when you refer to the shuttle run to

4    Soldotna, Kenai-Soldotna, that wasn't really a route,

5    was it?

6        A.   Well, he said he could turn it into it;

7    that's what Peter had told me.

8             Now, the shuttle run consisted of a lot

9    more than the shuttle run.  When I would get called

10   in, they would call me in at times early, because I

11   had to go to Northern Air Cargo and drop off, and I

12   had to go to the post office and drop off freight,

13   and I had to go to FedEx Express and pick up freight

14   from FedEx Express and bring it back to FedEx

15   Ground's lobby prior to going to the Kenai shuttle

16   run.

17       Q.   So when you refer to the shuttle run,

18   you're referring to the driving that you did for

19   Mr. Thompson under the contract with FedEx Ground?

20       A.   Well, Peter's the one that called me and

21   Steve's the one that called me.  And Peter -- Peter

22   and I and John all met and agreed upon he needed

23   somebody to run this, but he said that he couldn't

24   make it his own run, so it needed to run through

25   John.

Page 20

1          Q.    Let me stop you there.

2                Who's "he," who said that he couldn't make

3    it --

4          A.    Peter Ricks said this run was too small for

5    the company to want to approve, but he needed the

6    route to be done, and if I would run through John,

7    then he'd -- Peter Ricks was still the ultimate one

8    in control, as long as I did my job properly, and we

9    could go from there.  If there was problems with

10   anything, to talk to him and he would work them out.

11         Q.    When did that conversation that you just

12   referred to with Peter Ricks take place?

13         A.    Before I ever purchased the vehicle.

14         Q.    Do you recall the date?

15         A.    No, I do not.

16               And that's when he told me that if I got a

17   four-wheel drive vehicle, and if he approved it as

18   being a good vehicle to be able to drive over the

19   pass and so forth, where I could make it all the

20   time -- because they were having problems delivering

21   at times during bad weather conditions -- beings that

22   I was a truck driver, driving a bunny truck was

23   nothing compared to what I was used to, is the reason

24   why Peter decided that I would be a good person for

25   that route.

WILLIAMS v. FEDEX                                                                    JOE WILLIAMS
                                                                                    4/3/2006

Page 21

1          Q.    After your conversation with Peter Ricks

2    about the kind of van that needed to be purchased for

3    driving the shuttle run, did you enter into an

4    agreement with John Thompson that addressed how

5    you would be paid?

6          A.    That was -- it was changed so much.   And

7    Peter was there -- every -- every meeting that we had

8    was me, Peter and John.

9          Q.    Mr. Williams, I don't believe that you've

10   answered my question.

11              Did you have an agreement with John

12   Thompson about how you would be paid for the driving

13   that you did?

14         A.    Well, there was no set amount.   It depended

15   on the amount of stops, amount of boxes and amount of

16   things that Peter would add to it.

17         Q.    When did you reach an agreement with

18   Mr. Thompson about how you would be compensated for

19   your driving?

20         A.    Peter Ricks, John Thompson and I sat down

21   and agreed that I would be paid minus $100 of the

22   amount that the truck made per day -- or per week,

23   whatever that amount turned out to be.   John told

24   Peter that I would get all of it except $100 a week.

25         Q.    Mr. Williams, have you ever seen the

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 33

1    that other company.

2         Q.    All right.   But that was just the initial

3    part of your driving, wasn't it?   After some point,

4    you stopped working with Pomerantz; isn't that right?

5         A.    That was temporarily, until my truck was

6    purchased and ready to roll.

7         Q.    And once your truck was purchased and you

8    were driving, you were paid by Mr. Thompson; isn't

9    that right?

10        A.    Yeah.   The checks came from FedEx Ground --

11   or John Thompson FedEx Ground was on the paychecks

12   that I received after that time.

13        Q.    FedEx Ground wasn't paying you for the

14   driving, was it?

15        A.    Well, that's a matter of opinion, I guess.

16   I mean, they have another company that they used

17   prior to that, and it was -- I don't know -- the

18   temporary agency you call it, and --

19        Q.    If you had a gripe about your pay, while

20   you were driving during the -- the time after your

21   vehicle was purchased, didn't you go to Mr. Thompson

22   to complain about your pay?

23        A.    No.   I went to Peter Ricks, because he was

24   overall man, which he told everybody and let

25   everybody know.   He was the man that made everything

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 34

 1    work.  He was the one that could get any kind of

 2    disagreement, anything, straightened out at any time.

 3         Q.    Did Mr. Ricks tell you that you were an

 4    employee of FedEx Ground?

 5         A.    An employee?  No.  But I had to keep an

 6    employee attitude and represent FedEx Ground as top

 7    standards of FedEx Ground employees, statuswise.

 8         Q.    No representative of FedEx Ground ever told

 9    you that you were an employee of FedEx Ground, did

10    they?

11         A.    An employee, no.  That I had to represent

12    myself as an upstanding FedEx employee.

13         Q.    Mr. Williams, haven't you represented to

14    the IRS, during the year 2002, that you were

15    self-employed?

16         A.    Yeah.  And that's the way that everything

17    came to me.  I had no choice.

18         Q.    And as a matter of fact, all of the

19    paychecks that you received were issued to your

20    company, J.W.W. Trucking; isn't that right?

21         A.    Yes, they are.

22         Q.    And all of those paychecks were issued by

23    Mr. Thompson's bookkeeper; isn't that right?

24         A.    Yeah.  From him and his different

25    bookkeepers that he had, yes.

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

1      Q.    You never received a paycheck from FedEx
2   Ground, did you?
3      A.    Well, from their shadow company -- or
4   whatever kind of word company -- you have, prior to
5   my truck working.
6      Q.    All right.  So during the Pomerantz' time
7   you may have received a paycheck?
8      A.    I received a few paychecks, yeah.
9      Q.    All right.  Let's talk about the Pomerantz'
10  period of time.
11        Do you recall filling out an application to
12  work for Pomerantz?
13     A.    I'm sure there was one in all of Peter's
14  papers.
15        MS. BRADLEY:  I'd like to get that marked
16  as Exhibit 18.
17        THE WITNESS:  Can I continue on that?
18        MS. BRADLEY:  Actually, let's let the court
19  reporter mark the exhibit.  She can't type and mark
20  at the same time.
21        (Exhibit 18 marked.)
22  BY MS. BRADLEY:
23     Q.    Mr. Williams, you've just been handed
24  what's been marked as Exhibit 18, which is a
25  Pomerantz Staffing Services Confidential Employee

WILLIAMS v. FEDEX

1    misdemeanor.  And then the other one, I think, was

2    the same type of thing; it was a misdemeanor theft.

3         Q.   And those were before you turned 18, do I

4    understand?

5         A.   No.  They was af -- they went to court

6    after I was -- I wasn't a minor anymore.

7         Q.   Do you have any other convictions on your

8    record?

9         A.   No, ma'am.

10        Q.   Have you been involved in any other court

11   cases?

12        A.   I believe that covers everything that I've

13   ever been involved with.

14        Q.   All right.  How long did you work for

15   Thompson & Associates?

16        A.   I don't have the exact records, because I

17   had plowed snow for him several years, off and on,

18   prior to the FedEx Ground situation.

19        Q.   Do you have a business license for J.W.W.

20   Trucking?

21        A.   Yes, I do.

22        Q.   How long have you had a business license?

23        A.   Started trucking in Sterling.  I believe

24   it was '91, when I started my business license.

25        Q.   And did I get the name correct; it's J.W.W.

WILLIAMS v. FEDEX

1    Trucking?

2        A.    Yeah, just the initials -- just the

3    initials of my name, because my name is Joe Wade

4    Williams, J.W.W.

5        Q.    All right.  Have you had that business

6    license for J.W.W. Trucking --

7        A.    Yes.

8        Q.    -- since 1991?

9        A.    Oh, sorry.

10            Yes.  I don't believe I've ever let it

11    lapse, as long as I've had it.

12        Q.    When you did snowplowing work for Thompson

13    & Associates, were you also paid under J.W.W.

14    Trucking?

15        A.    Yes, ma'am.

16        Q.    Did you ever receive a check from

17    Mr. Thompson that wasn't made payable to J.W.W.

18    Trucking?

19        A.    Yes.

20        Q.    When was that?

21        A.    A few different times in there, that he

22    just paid out of his regular checking account and

23    just put my name on it.  I believe during the time I

24    was working for FedEx Ground, there were a couple

25    paychecks that just said "Joe Williams," in the

Page 52

```
 1        A.    Actually, John didn't have much of an

 2    interest in the route.  And that's why he said and

 3    stated that he'd threw us together and said:  Here,

 4    here it is.

 5        Q.    When you say --

 6        A.    He wasn't able to --

 7        Q.    When you say Mr. Thompson didn't have an

 8    interest, you just mean he wanted you to just do the

 9    work; isn't that right?

10        A.    Yeah.

11        Q.    But what my question was:  Did Mr. Thompson

12    have a proprietary interest in the route?

13        A.    I don't know exactly what a proprietary

14    interest is, so...

15        Q.    Did he have a business interest in the

16    route?

17        A.    He was getting paid for it; so, yeah, he

18    had a business interest.

19        Q.    And didn't he have a contract that covered

20    that route, as well?

21        A.    I believe he had some kind of contracts,

22    yeah, written ones.  Which I was told by Peter that I

23    could not have a written one, at the time, because he

24    couldn't put it in writing, to give me the shuttle

25    run on my own, and it had to go through John.
```

WILLIAMS v. FEDEX

1    your deal.  Other than the fact that we all three

2    went in that office and talked, every time there was

3    any kind of anything, Peter Ricks, John and I went in

4    the office and met, with any -- any talks of

5    anything, prior and during the time that I was

6    hauling freight.

7         Q.   You attended Mr. Thompson's deposition,

8    pretty much from start to finish, didn't you?

9         A.   Other than the hour of records that you

10   guys had prior.

11        Q.   Did you disagree with Mr. Thompson's

12   testimony?

13        A.   Didn't disagree.  But I noticed that he

14   kept mentioning the fact of the pay was for the

15   shuttle run to Kenai.  He never mentioned Northern

16   Air Cargo; never mentioned the post office or any of

17   those things.

18        Q.   Didn't he testify that you did the post

19   office run?

20        A.   I think, later on in the testimony, he

21   mentioned it.  But he never really came to say

22   anything other than that.  He never said anything

23   about Northern Air Cargo.  I don't know if he -- I

24   mean I know he should have been aware of it, because

25   he was the one getting the paycheck for all that.

WILLIAMS v. FEDEX

1    A.    Yeah.

2         Is that Papa John's?  Okay.  It looked like

3    an "ms" at the last there.

4    Q.    So are you with me on check 1266, that

5    that's issued to your company, J.W.W. Trucking?

6    A.    Sure looks like it.

7    Q.    All right.  And that's in December of 2000,

8    isn't it?

9    A.    Looks like them are zeros.

10    Q.    And let's turn to the next page.  Do you

11    see in the second column, the second check down,

12    check 1281?

13    A.    Uh-huh.

14    Q.    January 17th, 2001, again, issued to your

15    company J.W.W. Trucking by Thompson & Associates?

16    A.    Yup.

17    Q.    All right.  And then I'd like you to look

18    at the next page.

19         Do you see the check in the third column,

20    in the upper right-hand corner, check number 1296,

21    also issued to J.W.W. Trucking on February 5th of

22    2001?

23    A.    Uh-huh.

24    Q.    I'd like you to turn then to Exhibit 24.

25    Again, these are bank statements that Mr. Thompson

WILLIAMS v. FEDEX

Page 66

1    provided to me on Friday.  And this one is dated

2    March 25th of 2002, for the statement date.

3              Do you see that?

4              MR. ZOREA:  May I get an exhibit, please?

5              MS. BRADLEY:  (Handing document.)

6              THE WITNESS:  Which one are you talking

7    about now?

8    BY MS. BRADLEY:

9         Q.   The first page, in the third column.

10        A.   The top one there?

11        Q.   Right.

12             Do you see that check, 2087?

13        A.   Uh-huh.

14        Q.   And that's, again, payable to J.W.W.

15   Trucking, isn't it?

16        A.   Uh-huh.

17        Q.   Now, in February of 2002, which is the date

18   of this check, were you driving --

19        A.   Yeah.

20        Q.   -- for Mr. Thompson?

21        A.   But these checks wouldn't have been for

22   that.  The amounts, these would have been for money

23   he owed me for plowing.

24        Q.   All right.  Let's turn to the next page

25   then.  This is a statement dated April 23rd of 2002.

WILLIAMS v. FEDEX

1      A.    The one that just says Thompson &
2  Associates FedEx Ground, that one?
3      Q.    Yes.  In April, the statement dated April
4  23, 2002.
5          Do you see a paid to your company, J.W.W.
6  Trucking?
7      A.    Maybe I'm looking at the wrong check.  I
8  was looking at 0579.
9      Q.    Yes, I think we're together.
10     A.    Okay.  The statement is dated April 23,
11  2002.
12     Q.    Is that a check payable to your company?
13     A.    That one, I don't see the April 23rd.  So I
14  must be looking at the wrong one.
15     Q.    April 23 is right up at the top.
16         MR. MOSHE ZOREA:  The statement.
17         THE WITNESS:  Over here?  Oh, okay.  I was
18  looking at the one across from it that said 4-6.
19  BY MS. BRADLEY:
20     Q.    So the check that was payable to your
21  company was dated April 6th of 2002; is that right?
22     A.    I can't read it.  But okay.  It's too
23  small.
24     Q.    Do you have any reason to believe it's not
25  for the year 2002?

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 68

1      A.   I can't even read the amount that it's
2   written out for.
3      Q.   Doesn't it say $1,300?
4      A.   The one that's dated 4/6 says $1,300.
5      Q.   And in the lower left-hand corner it says
6   "shuttle," doesn't it?
7      A.   That one says shuttle.
8      Q.   Is that the check that Mr. Thompson issued
9   to your company for the services that you provided
10   driving the shuttle run in April -- or prior to April
11   6th of 2002?
12      A.   The amount would make me think that that's
13   probably what it was.
14      Q.   All right.  And was that the amount he paid
15   you on a weekly basis?
16      A.   No.
17      Q.   How much did he pay you on a weekly basis?
18      A.   It changed.  I think most of them averaged
19   14.  But, I mean, they're here, so we can find them.
20      Q.   All right.  Let's look on that same page.
21          In the third column, the fourth check down,
22   check 0624, do you see that one, issued to J.W.W.
23   Trucking?
24      A.   Yes, I do.
25      Q.   And this one, it also appears to be $1,300,

WILLIAMS v. FEDEX

1    doesn't it?

2         A.    That one does.

3         Q.    Did that represent the week's worth of

4    driving on the shuttle run?

5         A.    I think that was during the time that I was

6    requesting information, before, and then it had

7    changed, the amount, after I got the copies of what

8    the shuttle was receiving.

9         Q.    All right.  Well, let's keep looking at

10   these checks.

11             If I understand your testimony correctly,

12   you're saying you got paid more by Mr. Thompson at a

13   later date?

14        A.    I believe that after I had the paperwork

15   showing what the shuttle was running, it changed.

16        Q.    Let's look at the next page, then, of that

17   same exhibit, Exhibit 24.

18        A.    Which page?  Third page?

19        Q.    Yes, the third page.  In the left-hand

20   column, there are two checks payable to J.W.W.

21   Trucking.

22             Do you see that?

23        A.    Yes, I do.

24        Q.    And the first check appears to be in the

25   amount of $1,250.

WILLIAMS v. FEDEX

1          Do you see that; check number 2014?

2     A.    Yeah.

3     Q.    And then the next check below it, check

4 number 2122, also payable to J.W.W. Trucking for the

5 amount of $1,150.

6          Am I reading that correctly?

7     A.    $1,168.

8     Q.    68.  I apologize.  You can read better than

9 me.

10          And doesn't that check indicate that it's

11 for the shuttle run?

12     A.    That one says, Shuttle, yeah.

13          That was my whole thing:  A lot of them

14 didn't tell me anything.

15     Q.    All right.  Let's turn, then, to the next

16 page.  And this is the page that has statement date

17 May 23, 2002, at the top.

18          Do you see that?

19     A.    The top left hand one, is that the one

20 you're talking about?

21     Q.    Well, at the top, in the middle, it has May

22 23, 2002.

23          Do you see that?  Not the check; the

24 statement date.

25     A.    Oh, sorry.  Yeah.

WILLIAMS v. FEDEX

```
 1        Q.    And then if you look in the first column,
 2   the very first check is payable to J.W.W. Trucking.
 3             Do you see that?
 4        A.    Yes.
 5        Q.    Can you read the amount there?
 6        A.    $1,141.
 7        Q.    Doesn't it say $1,341?
 8        A.    Oh, I'm sorry.  Did I say it wrong?
 9             $1,341.83.
10        Q.    Had you spoken with Mr. Thompson by that
11   point, and requested that he compensate you more than
12   what he had been paying?
13        A.    I don't recall the exact date when I
14   started really worrying about this.  Because -- I
15   believe I was worried about it in the beginning,
16   because Peter had told me that that had been
17   averaging like $1,500 a week, and my checks were way
18   under that, for him only taking $100 out.  So during
19   the time, I was -- had -- went back and forth with
20   Peter, trying to, you know:  Well, what's going on.
21             And I believe later on you'll see the
22   differences in the -- in the amount of the -- when I
23   started actually getting documentations.
24        Q.    When you got some documentation that you
25   could then present to Mr. Thompson, so that he could
```

Page 72

1    pay you more; isn't that right?

2         A.   Yeah.   So that I would know what I was

3    getting, all of a sudden my checks got bigger.

4         Q.   Do you know how much Mr. Thompson received

5    from FedEx Ground for the shuttle run on a daily

6    basis?

7         A.   No, I don't.

8              And, see, that was the whole deal, my whole

9    worrying about -- previous to these ones, was even on

10   these checks say shuttle.   They don't have nothing to

11   do with talking about the post office or Northern Air

12   Cargo or any of that; all they say is shuttle.

13        Q.   When you went to Mr. Ricks about how much

14   you were getting paid, what did he tell you?

15        A.   He told me I needed to talk to John.   That

16   I should be getting paid more.   That he was pretty

17   assured that he was making more than that.

18        Q.   He was pretty sure that Mr. Thompson was

19   making more than that; isn't that right?

20        A.   Yeah.   That the shuttle run was making more

21   money than what he was telling me.

22        Q.   Mr. Thompson's the one who decided how much

23   to pay you, though; isn't that right?

24        A.   He's the one that wrote these checks out.

25        Q.   Wasn't he the one who decided how much they

WILLIAMS v. FEDEX

Page 73

1   should be for?

2       A.   Well, we agreed upon an amount.  But that

3   doesn't -- just because you agree upon something,

4   doesn't mean it always works right.

5       Q.   You were upset with Mr. Thompson, weren't

6   you, because you thought he was going to pay you more

7   than he ended up paying you; isn't that right?

8       A.   I was upset because of the fact that I

9   didn't get no documentations showing that he was only

10  taking $100 a week out.  And I wanted documentations

11  showing that he only took $100 a week, so that I knew

12  he was only taking $100 a week out.

13      Q.   Let's look at these checks and see if the

14  amount did change at some point.

15           Do you see the check at the bottom of the

16  first column?  It's payable to J.W.W. Trucking, dated

17  May 6th of 2002.

18      A.   Yup.

19           The one that's May 20th, there's another

20  one over there.

21      Q.   Do you see check number 0644, at the bottom

22  of the first column?

23      A.   Yes.

24      Q.   And isn't the amount of that check

25  $1,241.26?

Page 74

```
 1        A.    Yup.

 2              And then, the one right beside it is almost

 3   $100 more than the previous one.

 4              But, yeah, it shows that they varied.

 5        Q.    All right.  So check number 0645 is for the

 6   amount of $1,325.49.

 7              Do you see that, that the amount is

 8   actually below the check there?

 9        A.    $1,325.49?

10        Q.    Yes.  Uh-huh.

11        A.    Okay.

12        Q.    And then the check next to it, also payable

13   to J.W.W. Trucking was for the amount $1,323.

14              Do you see that?

15        A.    Yup.

16        Q.    And if you look at the middle column,

17   there's another check that's payable to J.W.W.

18   Trucking, check number 0615, in the amount of

19   $1,334.05?

20        A.    (Reviewing.)

21        Q.    Do you see that, in the middle column, the

22   very top, check number 0615?

23        A.    This one?

24        Q.    Right.

25        A.    Does that have my name on it?
```

WILLIAMS v. FEDEX

```
1       Q.    It looks to me to be J.W.W. Trucking.

2             Do you see that?

3       A.    Oh, over here?  No, that one's $3,000.

4       Q.    Are we on the same page?

5       A.    Oh, back here.

6       Q.    Okay.  It helps if we're on the same page,

7    Mr. Williams.

8             All right.  Do you see that check number,

9    0615?

10      A.    Yes.

11      Q.    And again, payable to J.W.W. Trucking?

12      A.    Yes.

13      Q.    All right.  And it looks to me that the

14   amount did go up, from at least the 1,100 to 1,200

15   range, as of April 2002; is that right?

16      A.    Yeah.

17      Q.    Is that because you had spoken with

18   Mr. Thompson?

19      A.    I think I -- I don't believe I'd still got

20   documentations even yet.  But he slowly started

21   increasing it, from what I remember.  And then, when

22   I got actual documentations, then it was closer to

23   what it should have been.

24      Q.    What amount did you end up getting later

25   on?
```

WILLIAMS v. FEDEX

1      A.   I don't know.  We have to look through,

2    back through these, to see what the last ones ended

3    up being, I guess.  I don't recall exactly.  But from

4    as best I remember, they did change as it went up, as

5    I finally started getting documentations, which

6    wasn't until, pretty much the end of the -- the end

7    of the situation.

8      Q.   Let's turn to the next page, that has

9    statement date May 23rd, 2002.

10          And if you look in the first column, the

11    second check down, which is check number 2135 - do

12    you see that - it's also payable to J.W.W. Trucking?

13      A.   Yes.

14      Q.   It's dated April 22, 2002?

15      A.   Yes.

16      Q.   And if you look at the memo at the bottom,

17    it says "FedEx shuttle," doesn't it?

18      A.   Yes, it does.

19          I believe that was a two-week thing that he

20    had paid me on, because he didn't have money for a

21    week prior.

22      Q.   So he paid you $3,000 to cover two weeks;

23    is that right?

24      A.   I believe that's what that one was, but I'm

25    not positive.

WILLIAMS v. FEDEX

1    Q.   And you think that because the amount is

2   higher than the others?

3    A.   Yeah, yeah.

4        I remembered a couple of times that he

5   didn't have the money and asked me if I could wait.

6    Q.   Let's look at the next page, the statement

7   dated June 25th of 2002.

8        Do you see, in the first column, check

9   number 0647 --

10   A.   Yes.

11   Q.   -- payable to J.W.W. Trucking?

12   A.   Yes.

13   Q.   That one is consistent with the amounts on

14  the previous pages, isn't it, in the range of twelve

15  to $1,300?

16   A.   Yeah.  It went down from the original

17  $1,100 -- or up from the original $1,100.  But, yeah,

18  it's...

19   Q.   And that check is for $1,295.94; isn't that

20  right?

21   A.   Yes.

22   Q.   Let's look at the next column.  There are

23  two checks there, the first and the second one, both

24  payable to J.W.W. Trucking.

25       Do you see those checks?

WILLIAMS v. FEDEX

1          A.     (Reviewing.)

2          Q.     Oh, I apologize.  That first one is to

3    Thompson.

4                 Let's look at the second one, J.W.W.

5    Trucking.  It's very small print here.

6                 Do you see that second one, check 0648?

7          A.     Oh, yes.

8          Q.     And then, if you look to the right, there's

9    one, 0649, in the next column, that's also payable to

10   J.W.W. Trucking?

11         A.     Yeah -- that, I was trying to -- I'm

12   wondering if that could be back stuff he owed me from

13   plowing still, because the amounts are...

14         Q.     The amount's less, isn't it:  $977?

15         A.     Yeah.  I don't believe -- that shuttle

16   never made that, that low.

17         Q.     All right.  So you were doing snowplowing

18   work for Mr. Thompson during the same time?

19         A.     Yeah.  And he had owed me some money that

20   he said he hadn't got paid from Express, that it took

21   a little while for it to come in.

22         Q.     So check 0648 may be payment for your

23   snowplowing services, as opposed to driving?

24         A.     Yeah.

25                And the 0680, I believe, the $600 one --

```
 1    oh, wait; that one ain't even mine.

 2              Let's see.  Where was the other one?

 3              Oh.  The top one, that was $1,225, it

 4    says -- it's got the date on it, like it would have

 5    been the shuttle.

 6              Oh, boy.  That $900 one does, too.

 7              I don't know.  I don't recall.

 8         Q.   But you do recall doing snowplowing for him

 9    during the same time?

10         A.   Yeah.  I believe them invoices would have

11    showed that.  And just because I invoiced him --

12    sometimes it took him a while to come up with the

13    money to pay me.  But he's got a week thing on there,

14    which makes me think that it would have been the

15    shuttle, but...

16         Q.   Let's turn three pages to the statement

17    that's dated July 24th of 2002.

18         A.   Three more down?

19         Q.   Yes.

20              Do you see the middle check?

21         A.   (Reviewing.)

22         Q.   July 24th of 2002.  There's only five

23    checks on the page.

24         A.   Yeah.  For $1,940, that one?

25         Q.   Yes.  The check 2109, payable to J.W.W.
```

WILLIAMS v. FEDEX

1    Trucking.

2        A.   Can't see what he -- can't read what he

3    wrote down it was for.

4        Q.   Looks to me it says "bal" - I guess for

5    balance - "due snow removal."

6        A.   Oh, yeah.  That could have been the last of

7    the money he owed me for snow removal, that was paid

8    on 6/24.

9        Q.   Of 2002?

10       A.   Yeah.

11       Q.   All right.  Let's look at the next page.

12            Do you see, in the second column, the very

13   bottom, there's a check 0703 payable to J.W.W.

14   Trucking?

15       A.   Yes.

16       Q.   And the amount of that check is $1,291;

17   isn't it?

18       A.   Yeah.

19       Q.   And the check just to the right of that,

20   check number 0704, also payable to J.W.W. Trucking,

21   in the amount of $1,308?

22       A.   Yes.

23       Q.   Why do these amounts vary from week to

24   week?

25       A.   A different amount of boxes that were taken

Page 81

1    down on that shuttle run.

2        Q.    How did you get compensated for the boxes?

3        A.    I just got a lump sum.  It was supposed to

4    be minus what -- what he got, and just -- he was

5    supposed to just keep $100, and the rest of it was

6    supposed to be mine.  So it changed on how the pay

7    was for the amount of the boxes that were delivered.

8        Q.    Is it your understanding, that under

9    Mr. Thompson's contract with FedEx Ground, he was

10   compensated based on the number of boxes or packages

11   that were handled?

12       A.    That's -- yeah, that's what I was told.

13       Q.    Who told you that?

14       A.    That's what Peter and them had told me,

15   that the pay was all designed on so much per stop and

16   so much per box, and then there was some other money

17   for different things that came in.

18       Q.    How many stops did you make on the shuttle

19   run?

20       A.    Well, that's the whole thing that I had a

21   problem with, is these are just the shuttle run;

22   these aren't talking about the Northern Air Cargo,

23   the post office, the times I stopped at Girdwood.

24   They don't show any of that.  That was part of my

25   complaint.

1       Q.    That Mr. Thompson wasn't paying you for

2   what you thought you were owed?

3       A.    I didn't see -- and that's why I was

4   complaining.  I didn't see where there was

5   documentations showing that the post office delivery,

6   or any of that, was included with these paid.  They

7   may have been; I just hadn't got any records of it

8   and wasn't able to get anything to show me.

9       Q.    Did anybody promise, at the time you

10  entered into the agreement to do driving, that you

11  would have access to the paperwork that showed how

12  Mr. Thompson would be paid?

13      A.    Peter told me I would have copies, would be

14  available right there, and nothing would be hidden.

15  I could see the -- the -- because all that goes

16  through, and the next day there's a thing in the

17  office showing how many boxes were delivered and all

18  that type of thing --

19      Q.    Did you fill out that paperwork?

20      A.    -- and I would be able to --

21           Did I fill out any paperwork?

22      Q.    Yes.

23      A.    No, I didn't fill out any paperwork.

24           He said that it -- they have it; John would

25  have it.  Right there, it would be right there in the

WILLIAMS v. FEDEX                                                    JOE WILLIAMS
4/3/2006

Page 83

1    files.  There'd be copies of it.  Which later Nicole
2    was showing me copies of some of it.
3         Q.    Let's talk about what you did on a daily
4    basis.  What time did you get to the terminal?
5         A.    It depended on -- they'd call me in early
6    sometimes.  I don't have the exact records.  There
7    was stuff I had to fill out.
8              Might ask Steve if he can say -- if they
9    kept copies of the deals we filled out, that I had
10   put the time I came in and when I had locked up at
11   night, the time I locked up.  Because they had a copy
12   of that; I didn't.  Because it changed; it wasn't
13   always the same.  There was times they said that I
14   had so much to deliver to the post office, there
15   would be two runs to the post office.  There wasn't
16   enough room to get it all in one.  So they'd call me
17   in earlier, which then I'd be there a half hour or an
18   hour earlier, so that I could get that done, because
19   the FedEx Express had to be picked up.  There was an
20   hour time frame.  And it couldn't be picked up before
21   and it couldn't be picked up after.  So I had to
22   get --
23        Q.    What time did it need --
24              I'm sorry.
25              What time did it need to be picked up?

WILLIAMS v. FEDEX

Page 84

1        A.    I believe it was 14:00 to 15:00 or 15:00 to

2    16:00.    They had military time wrote on it.    There

3    was an hour time; it was either 4:00 to 5:00 or 5:00

4    to 6:00.    I think it was 4:00 to 5:00.    So I had to

5    have the post office and Northern Air Cargo done

6    prior to that, for that to be picked up, because they

7    didn't want it picked up before or after; they wanted

8    to be able to have all their inventory and all of

9    their stuff ready, and that way there wouldn't be any

10   mixed boxes or boxes that were delayed because I

11   picked up too early or et cetera.

12       Q.    Did you come to the terminal in the

13   mornings?

14       A.    In the mornings?    Yeah, on the way back

15   from Kenai, it was early morning; it was a.m.

16       Q.    What time did you begin your run?

17       A.    I think it was around two to three o'clock.

18   It depended on the times.    Because I'd had to do the

19   post office, and I had to get that done before, to

20   pick up FedEx.    There was times that the weather was

21   bad, this and that, that I came in at different

22   times.    Without having the copies of those stuff, I

23   couldn't swear to an exact any time.    I know I was

24   there in that I did the post office run, the Northern

25   Air Cargo run, and picked up at FedEx Express on the

1    worries of anything, so...

2           MS. BRADLEY:  I'd like to take a quick

3    break now, so Mr. Mondragon can do something.

4           Off record.

5           (A recess was taken.)

6    BY MS. BRADLEY:

7       Q.   Mr. Williams, how did you learn about the

8    opportunity to drive with Mr. Thompson under his

9    contract with FedEx Ground?

10      A.   John Thompson and I had been friends, and

11   knew that the seasonal thing -- I'd rather have a

12   year-round, weekends off, and time to spend with my

13   son, beings I just got custody of my son.  And he

14   knew I was going -- doing that, because I had plowed

15   for him, and I talked to him about getting custody of

16   my son.  So he told me that he was working for them,

17   and that it sounded like everything was going really

18   well, and that it would be a good opportunity for me

19   to -- to make less per hourwise or per weekwise, but

20   be able to have the weekends off and be year-round

21   and be able to have a better life with me and my son.

22   So anything to be better for my son, I was up to.

23      Q.   Did Mr. Thompson tell you that he was an

24   independent contractor under contract to FedEx

25   Ground?

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 89

1        A.    Yes.  He said he had a contract with FedEx
2    Ground.  And had more than one contract, is what he
3    had told me, and that he had more than one
4    shuttle and more than one -- or maybe not shuttle,
5    but more than one vehicle running, and the company
6    was growing and everything.  It was supposebly a real
7    good company, and a real good thing, so far that he
8    knew.
9        Q.    What role did FedEx Ground play in the
10    early discussions that you had with Mr. Thompson
11    about you becoming a driver for him?
12        A.    Well, I don't know if FedEx Ground did.
13    Well, I guess it did.  Peter Ricks and John Thompson
14    and I talked about this in his office several times.
15    And he kept -- Peter kept telling me, the company,
16    the way it's growing, showed me the financials of how
17    much FedEx Ground was gaining and how an opportunity
18    it would be, and how -- the chances of it being a
19    good company, because it had been just bought out.
20    It was RTS or RPS or whatever it was company before.
21    That it was a good opportunity, is basically the way
22    Peter and John, you know, were showing me and telling
23    me, you know.  And that it would be worth investing a
24    truck, because I would have a good steady, you know,
25    weekly, year-round job.

Page 90

1    Q.    Did Mr. Thompson ask you to buy the truck

2    because he couldn't afford to buy one himself?

3    A.    He may have.  He was too tapped out.  And

4    Peter had told me that he would like to have that as

5    a separate contract, but it -- supposebly wasn't a

6    big enough route, or something, to be able to be that

7    way.  There was too much other paperwork he had to do

8    to do it, so it would be better if he had -- if John

9    had somebody that had the finances to -- to buy a

10   truck and -- and to go from there and work as a team.

11   Q.    So do I understand your testimony, then,

12   Mr. Ricks told you that there wasn't a separate route

13   that he could give to you, but you could work for

14   Mr. Thompson and do the shuttle run?

15   A.    Yeah.  He said, at that time -- at that

16   time, it wasn't feasible enough; it could be done,

17   but it wasn't feasible enough to do it, because it

18   wasn't a big enough route, or something like that.

19   Something -- I don't know exact, but something

20   similar to that.  That later, down the road, there

21   was other opportunities; there was other things

22   going, because the company was growing and growing

23   and growing.  And as long as I did my job right and

24   was able to make it over Turnagain Pass -- other

25   drivers had troubles making it over it, during bad

WILLIAMS v. FEDEX

```
 1   windy days and snow days, which I was a truck driver

 2   and used to pulling, going over that pass in way

 3   worse conditions than -- than most people ever do.

 4       Q.   So Mr. Ricks explained to you that you

 5   didn't have a separate route, and you weren't a

 6   contractor to FedEx Ground; isn't that right?

 7       A.   He said I had to work through John.  It had

 8   to be ran through John, because he didn't want to run

 9   a separate -- separate deal at the time.  And I asked

10   him, I said:  Well, you know, what would I have; what

11   reassurances do I have of having, you know,

12   everything working right?  And he said:  Even if

13   something bad went wrong, that he was the one that

14   was ultimately in control, and that he could change

15   and he could make it a different run, he just didn't

16   want to at that time.  So I didn't have worries, and

17   then that's why I bought the new truck, that was

18   four-wheel drive and et cetera.

19       Q.   Did you understand that Mr. Thompson, as

20   Thompson & Associates, was a sole proprietorship

21   under contract to FedEx Ground?

22       A.   Yeah.  Almost everybody I know that has a

23   company is a sole proprietor, so I'm used to being

24   around people in that type of a situation.

25       Q.   In fact, you had a sole proprietorship
```

1    contact John.

2         Q.    Didn't Mr. Thompson terminate your

3    agreement?

4         A.    He tried to, and Peter said no, I'm the one

5    in control.  And eventually he went over Peter's

6    head, and Peter found out that he wasn't in control;

7    and then I was terminated.

8         Q.    Right.

9              And ultimately it was clear to you, wasn't

10   it, that Mr. Thompson was the one who had the right

11   to terminate your employment?

12        A.    Later down the road; not in the beginning.

13   Peter told me that he was the one in control; he had

14   the right to change it.  I believe he said it in

15   front of a few other people --

16        Q.    But, in fact --

17        A.    -- Steve included, that he had the right to

18   turn that into his own contract for me, not John,

19   eliminate John completely from it.  And he was

20   debating doing that.

21        Q.    Didn't happen, did it?

22        A.    And he hadn't made up his mind.

23        Q.    Didn't happen, though, did it?

24        A.    No.  But he kept promising me he would.

25        Q.    Did he have the authority to promise that?

WILLIAMS v. FEDEX

Page 101

1    that's what it says, that's what it says.

2        Q.    And did you fill this out accurately?

3        A.    I believe part of it was filled out by me

4    accurately.

5        Q.    And that's the exception of the first two

6    lines; isn't that right?

7        A.    Yeah.  And the backdating, probably.

8        Q.    Did you backdate your signature?

9        A.    I believe that there was a few things

10   that -- like on this (Indicating), that Peter had us

11   backdate, because it was stuff that he was supposed

12   to have had in before.  But maybe it wasn't this;

13   maybe it was different.  There were some other

14   papers, like three or four weeks after I had got my

15   FedEx truck working that he forgot that he didn't

16   want to get in trouble.  I don't know.  I never kept

17   copies of any of that.  Never asked for copies of it.

18   There was an awful lot of stuff that was done ahead

19   of time.  I don't recall if this one is or not.

20       Q.    You don't have any specific recollection

21   that this document is not dated accurately, do you?

22       A.    Exact, no.

23       Q.    Did you represent that you were a

24   subcontractor at the time you filled this out?

25       A.    In the beginning, that's what I was told I

WILLIAMS v. FEDEX

1    was.

2        Q.    Who told you that?

3        A.    John said I would be subcontracted to him.

4        Q.    Once you filled this form out, you were

5    allowed to drive for Mr. Thompson, weren't you?

6        A.    I believe I was driving previous to this,

7    but I don't know.  Maybe it was all done prior.

8            There was employee films that I watched;

9    there was all kinds of stuff that was done before.  I

10   don't know.

11       Q.    Did this provide insurance so that you

12   could drive?

13       A.    Actually, the insurance stuff I kept

14   getting notices that they hadn't received it.  And I,

15   later down the road, had pulled that up, and

16   Mr. Mondragon helped us figure it out, because the

17   documentations hadn't been through on time, and there

18   was a lot of the insurance stuff that actually wasn't

19   in effect; it was quite a while down -- the Chevy

20   dealership, GMAC Financing had their own insurance on

21   the truck, because they didn't get documentations of

22   the insurance being provided for it by FedEx Ground.

23       Q.    Mr. Williams, I'd like to have you turn to

24   Exhibit 12, which I believe is in front of you.

25       A.    The record of the road test, is that what

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 109

1      Q.    Do you still have those records,
2  Mr. Williams?
3      A.    Yes.
4            And the other one is in your hand; I can
5  see it right now, on the back there, an amount.   And
6  that amount was minus the $4,000 down, on the back
7  page.   That was the original invoices of it.
8            (Thompson Exhibit 10 referenced.)
9  BY MS. BRADLEY:
10     Q.    I'll hand you what's been marked as Exhibit
11  10, Mr. Williams.   And it's my copy of the exhibit.
12     A.    Yes.
13     Q.    I think you're referring to the last page
14  of Exhibit 10; is that right?
15     A.    Yes.
16     Q.    And that document shows how much you paid
17  for the van?
18     A.    I believe so.
19     Q.    So that $36,000 figure, in the upper
20  left-hand corner, is that the amount?
21     A.    I believe that was the amount after my
22  $4,000 down.   But I tried to contact Tony Chevrolet.
23  Tony Chevrolet has been bought out by Lithia, and to
24  get the exact -- all I have is a similar type deal
25  like this in my records -- but to get the exact copy

1       Q.    Pick up and --

2       A.    -- how they -- how they put it on to there.

3       Q.    Do you know whether the other drivers, that

4   worked under Mr. Thompson's contract, were P&D

5   drivers?

6       A.    I do not know for positive on that either.

7   They probably were, from what I think I remember the

8   P&D meant, but I'm not positive.

9       Q.    They had regular pickups every day, didn't

10  they, the other drivers?

11      A.    Yeah, I think the majority is drop-offs and

12  some pickups.  But I think the majority of it's

13  dropping off than to bring them back, from what I

14  seen.

15      Q.    The other drivers had a different kind of

16  run than you did, didn't they?

17      A.    Well, according to Peter, yeah.  That

18  was -- that was Peter's whole deal, is this is a

19  unique deal, this is a separate deal.  That's why he

20  told me everything was different, because of the fact

21  this was a complete unique thing that they had.  It

22  wasn't like any of their other stuff.

23      Q.    But it wasn't a contracted route, either,

24  was it?

25      A.    Hadn't been yet.

WILLIAMS v. FEDEX

Page 154

1    mechanical failure or what?

2         Q.   Sure.

3         A.   I would have probably called Alaska Sales,

4    or Tony Chevrolet, where I bought it.

5         Q.   You didn't call FedEx for that, did you?

6         A.   No, I would have had to call.  If I would

7    have been down, I would have had to call Peter and

8    let them know.

9         Q.   But FedEx didn't fix problems with your

10   truck, did they?

11        A.   No.  They inspected it, but didn't do any

12   work on it.

13        Q.   You were responsible for the maintenance on

14   your truck, weren't you?

15        A.   Yeah.  They had a guy that came in there

16   that offered his -- did -- did work on other

17   vehicles, that inspected my vehicle, that offered

18   stuff.  And I said:  Well, that's why I got a

19   warranty; I don't have to worry about it.

20        Q.   How did you learn that your delivery work

21   for Mr. Thompson was ending?

22        A.   He called me, I believe, is what he

23   testified.  He called me on the phone and told me

24   that he had to do something different, because his

25   company wasn't making enough money, with all the

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 155

1    other delivery stuff that he had.

2        Q.    Did you tell him that you wanted to

3    continue driving?

4        A.    No, I don't believe I did.

5        Q.    What did you tell him?

6        A.    I told him that's screwed up, if I remember

7    right, and I says:  We'll see about this.  And I just

8    left it at that.  I didn't scream or yell.  And then

9    I believe -- I believe I was working the day he

10   called me, and I waited until the next day, and I

11   went in and talked to Peter about it, if I remember

12   correctly.

13       Q.    Do you remember the day that you received

14   the news from Mr. Thompson?

15       A.    The actual date of that day, no.

16       Q.    Do you recall the month?

17       A.    Nope.

18       Q.    Was it October of 2002; does that refresh

19   your recollection?

20       A.    I believe I worked another three weeks

21   after that, after he told me.  So probably go to the

22   last day I worked, and probably go about three weeks

23   before that.

24       Q.    Do I understand he gave you three weeks

25   notice, then, that he was terminating you?

WILLIAMS v. FEDEX

Page 161

```
 1   you're doing a good job.  I said:  The only thing you
 2   have that's anything was on a day I had off, and I
 3   had a disagreement on the day I had off.  I said:  It
 4   didn't have nothing to do with the company.  And he
 5   goes:  I know.  He says:  You're a good person; I
 6   want to keep you; that's why you continue to work.
 7   He said he was going to work the Fairbanks run in --
 8   or before he gave it to John, just gave it and kicked
 9   me out with nothing, he was going to do one or the
10   other:  Either he was going to make it into a
11   contract and going to get me into the Fairbanks
12   thing, or was going to do something, not terminate me
13   just on John's request.
14        Q.   Did Mr. Ricks tell you that you had a
15   contract with Mr. Thompson and not FedEx Ground?
16        A.   We -- we made a verbal agreement.  We
17   had -- I had a verbal agreement with John Thompson
18   and Peter Ricks together.
19        Q.   I'm asking you what --
20        A.   I had no written contract with John
21   Thompson.
22        Q.   I understand.
23        A.   We had a verbal agreement together.
24        Q.   I understand that you believe you had a
25   verbal agreement at the beginning.
```

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 163

1    have an agreement with John Thompson.

2        Q.    Are you saying Mr. Ricks never told you

3    that Mr. Thompson was an independent contractor with

4    FedEx Ground?

5        A.    Oh, he told me it was a FedEx Ground, sure.

6        Q.    He told you that Mr. Thompson had an

7    independent contract, right?

8        A.    Yeah.

9        Q.    Right.

10        And he told you that if you were upset

11   about the termination of your contract, you needed to

12   take it up with Mr. Thompson, right?

13       A.    No.  He said we made an agreement together,

14   and he was going to honor that agreement.  And the

15   agreement was -- we all sat down together, and we was

16   working as a team to help this company prevail, okay?

17       Q.    Mr. Williams --

18       A.    I had to work under John Thompson's

19   contract, because he couldn't yet make it -- this is

20   what he told me -- he couldn't yet make it in there,

21   and he was trying to get it approved, and trying to

22   go with the paperwork to have it approved, to have it

23   as a separate deal.  And he said at any time he could

24   do that, he was just debating, because when he did

25   that, there was other financial stuff that he -- he

WILLIAMS v. FEDEX

1    he had talked to Peter, and that there was other

2    people that were applying for this position, but that

3    Peter had this open.  And if I went through him, with

4    him, beings that I had so many years of truck driving

5    experience, that I could work into a good

6    opportunity.

7        Q.    Wasn't it Mr. Thompson who required you to

8    purchase your own vehicle?

9        A.    He didn't have a vehicle, and the job

10   called for a vehicle, and it was up to Peter to

11   decide what kind of vehicle could or couldn't be

12   used --

13       Q.    So the answer --

14       A.    -- for the run.

15       Q.    -- to my question is yes, isn't it?

16       A.    I guess, kind of.

17       Q.    Paragraph 2.3 says that Mr. Ricks offered

18   you a three-year contract, with an option to renew.

19             Is that your recollection?

20       A.    He told me the way it went is a three-year

21   deal is the way most of the contracts is wrote, and

22   that's when they usually went through.  As long as

23   everything was done right, it was -- most of the

24   contracts was wrote on a three-year type of thing.

25       Q.    Did he tell you that you would have a

WILLIAMS v. FEDEX

1    three-year contract?

2        A.    He told me that John's was up in between.

3    But mine, as far as if he made it a contract - which

4    he said he wanted it to turn out being - that it

5    would be a three-year, from what I remember.  The

6    other thing that I was talking about in the beginning

7    was the Fairbanks run that could still have -- have

8    went.

9        Q.    So when you talk about having an agreement

10   with Mr. Ricks, you're referring to the Fairbanks

11   route?

12       A.    That was, yeah, part of the thing we were

13   talking.  We were also talking about whether he would

14   turn that shuttle run into its own contract.

15       Q.    So you were negotiating with him, so that

16   if that -- either the shuttle run turned into a route

17   or the Fairbanks run turned into a route, you would

18   have the ability to contract with FedEx Ground?

19       A.    Yeah.  That's what I would have preferred.

20   And according to him, that's what he would have

21   preferred.

22       Q.    And you would have preferred that rather

23   than working for Mr. Thompson, I take it?

24       A.    Well, it just would have been a better

25   opportunity for myself.  I would have had somewhere

WILLIAMS v. FEDEX

Page 184

1  in doing the shuttle run to Soldotna, did you expect

2  to receive benefits, like you were an employee?

3       A.    When I started the whole deal, I was hoping

4  and expecting to be treated as a subcontractor.

5       Q.    You didn't expect to get retirement

6  benefits, did you?

7       A.    Was I expecting retirement benefits?  I was

8  expecting the job to be what he told me, where I

9  would be able to put in my own retirement.

10      Q.    You didn't expect vacation pay, did you?

11      A.    No.  They didn't say we could get vacation

12 pay.  But there was something, after a certain amount

13 of time, that we could take off and have somebody

14 else fill in.  There was -- there was something that

15 Peter was saying that we could do.  After a certain

16 amount of time in there, we could have somebody else

17 take and run our route temporary to where we went on

18 vacation.  So I was expecting to be able to work out

19 a way to have a vacation.

20      Q.    You've testified that you didn't think

21 it was fair that your contract was terminated by

22 Mr. Thompson, because you felt that you were doing a

23 good job as a driver.

24      A.    Yes, ma'am.

25      Q.    Your lawyer has alleged a claim that you

WILLIAMS v. FEDEX

1    than you did?

2        A.    Yeah, there was -- Nicole told me once, she

3    says:  I can't tell you, but check into this, because

4    I don't think you're getting paid for it.  That is

5    the only way.  I don't...

6        Q.    Do you have any reason to believe that

7    Mr. Thompson wasn't paid for all the services that

8    you provided?

9        A.    No.

10       Q.    Did FedEx Ground receive any benefits that

11   you provided that Mr. Thompson didn't get paid for?

12       A.    Nothing that I know of.

13       Q.    So your gripe is really with Mr. Thompson,

14   isn't it, that he didn't pay you for what he got

15   paid?

16       A.    It's -- it's the combined thing.  I mean, I

17   made an agreement with Peter Ricks and John Thompson,

18   you know, to -- to do my job.  And I did my job.

19            And you can ask Steve.

20            I did my job good; I wasn't a slacker; I

21   didn't damage his merchandise; I didn't -- you know,

22   I did my job right.  And I made the agreement with

23   the -- you know, I didn't go into the agreement only

24   with John.  It was the three of us made an agreement,

25   you know?  I wanted to make sure that I was -- and I

WILLIAMS v. FEDEX

Page 193

1   to get documents relating to your van payments from

2   GMAC?

3         A.    Yes.

4         Q.    When do you expect to get those documents?

5         A.    I have no idea.  They don't even know if

6   they can get them.  Tony Chevrolet is no longer in

7   business.

8               (Exhibits 28, 29 and 30 marked.)

9   BY MS. BRADLEY:

10        Q.    Okay.  Mr. Thompson - I'm sorry -

11  Mr. Williams, let's put these three exhibits in front

12  of you.  Let's start with Exhibit 28.  And I'll

13  represent to you that this is a copy of your 2002 tax

14  return that was given to me by your attorney.

15              Is this a complete copy of your tax return

16  for the year 2002?

17        A.    The lady that helps me with taxes faxed a

18  copy.  She's got the receipts and stuff.  She keeps

19  track of everything.

20        Q.    Did you have a 1099 that accompanied your

21  2002?

22        A.    Probably, with the original 2002 taxes,

23  yeah.

24        Q.    Does your lady who does your taxes for you

25  have the 1099?

WILLIAMS v. FEDEX

1    BY MS. BRADLEY:

2        Q.    You understood that you completed these tax

3    returns under penalty of perjury; isn't that right?

4        A.    That's the way they tell you, when you do

5    them, I guess.

6        Q.    Is your company, J.W.W. Trucking, a

7    corporation?

8        A.    No.

9        Q.    What is it?

10       A.    Sole proprietorship, I guess is what they

11   call it.

12       Q.    Schedule C, on Exhibit 28, your 2002 tax

13   return, you list $38,470 as gross receipts or sales.

14             What does that represent?

15       A.    I don't know.  I guess whatever all my

16   stuff was, income that was reported.

17       Q.    Was that income from your contract with

18   Mr. Thompson?

19       A.    I had snowplow stuff, I had -- there was a

20   couple of things that came from John, because he

21   had -- I think even by those checks, is he had paid

22   me for plowing and for the -- the shuttle run and

23   stuff, too.  It was a combined thing.  It must have

24   been what everything that I handed the lady to help

25   me figure out ended up being.

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 204

1      Q.   I'd like to have you look at Exhibit 32.

2   And this is a set of requests for admission that we

3   served on your counsel, and it contains the answers

4   that we received back.

5           Would you turn to the second page - I'm

6   sorry - the third page.  It contains the requests for

7   admission.

8      A.   Yes.

9      Q.   Have you read these?

10     A.   Yeah, we went through them.

11     Q.   Are these accurate, to the best of your

12  ability?

13     A.   Yeah.  We went through them.  And that was

14  the best stuff that -- I mean, there was a couple

15  things that weren't really exact.  Like it really

16  wasn't a Chevy van, it was a Chevy truck with a box

17  van put on it, but, you know, it was close enough, so

18  I admitted to that.

19     Q.   Okay.  Exhibit A, if you look at the last

20  page, it refers in the Bill of Sale to a Chevy

21  Package Van, doesn't it?

22     A.   Yeah, it says, Package Van.

23     Q.   Is that more accurate?

24     A.   Yeah.  Kind of, yeah.  Because it was a

25  truck with a van thing put on it.

WILLIAMS v. FEDEX

1      A.    Yeah.    I had talked to Steve before, in

2  between all this, before it came right down -- and,

3  you know, I think we talked a little, because I was

4  still kind of wanting to.  But that Fairbanks thing

5  hadn't got to where it could be approved or anything.

6      Q.    So the contract you were seeking from

7  Mr. Ricks never did come about?

8      A.    Well, the type person I am, and for my

9  experiences, the bulk-type delivery and the line-haul

10 type thing, I feel that I could do the best out of --

11 of everything.  And that's the type -- you know,

12 because I'm a truck driver that likes to -- to drive,

13 not go door to door.  And that's why I took that job

14 in the beginning.  So that would have been the only

15 type things that would have been -- that I would have

16 wanted.  There was some -- the new FedEx Ground or

17 house delivery -- home delivery thing, that was

18 starting up, but that wasn't the type thing that I

19 wanted to -- to do.

20     Q.    You weren't interested in anything that

21 involved stops and pickups; is that right?

22     A.    No, I was more -- I'm more the type person

23 that would like to just load the truck up, go, drop

24 off, come back; you know, that type of person, so...

25     Q.    Are there any other damages that you are

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 215

1    BY MR. ZOREA:

2        Q.    You can answer.

3        A.    Oh.

4            I don't recall anybody saying that it had

5    to be from John.  It was just paperwork I had to look

6    at, figure out what -- what it was to do per day.

7    Other than when Peter would come out, every now and

8    then, and hand me a check to take to the post office.

9    And then that was usually something he would -- a lot

10   of times handed me, or he'd give to Nicole to give to

11   me to take to the post office.

12       Q.    Do you recall -- the check that you took to

13   the post office, do you recall if that had John

14   Thompson's name on it, or -- or was it FedEx Ground?

15       A.    No.  It was a pay for their packages, that

16   I had to -- they had to stamp a receipt, and a couple

17   other things that I had to bring back, proving that I

18   dropped off, because some of the checks were pretty

19   big.

20       Q.    Did Mr. Thompson ever direct you to deliver

21   packages to Girdwood, home-delivery packages to

22   Girdwood?

23       A.    I don't believe that -- I don't even know

24   if John knew about -- I guess he probably found out

25   about the deliveries.  It was just for a little

WILLIAMS v. FEDEX

1    while.  Because it -- I usually got there too late.

2    It wasn't working out.  It was hard to find the

3    people at -- God, I think there was times I didn't

4    get out to Girdwood till 6:00, 6:30, or so.  And at

5    that time, it was -- I think that was in the very

6    beginning, and it was still winter, and it was dark,

7    and it wasn't -- wasn't easy to find the addresses.

8        Q.   You testified earlier that you had about

9    three hours worth of miscellaneous duties that you

10   did prior to leaving on the shuttle run to Kenai; is

11   that correct?

12       MS. BRADLEY:  Objection as to form.

13   BY MR. ZOREA:

14       Q.   Is that correct?

15       A.   Yeah.  It -- it depended.  It changed.  But

16   most of the -- most of the time, it took a little

17   while to go back and forth across town.  And when

18   I had to do more than one run, in order to get all

19   the stuff to the post office, and that all added up,

20   there was -- there was days that it was probably

21   right at 3:00, and may have been days I might have

22   been able to get it done in an hour and a half.

23   There was some days that things weren't real, real

24   heavy.  But most of the days things were -- they were

25   doing pretty good.  They were -- obviously, still

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

235

```
 1              CERTIFICATE OF REPORTER

 2

 3        I, GAIL RUTH PECKHAM, RPR, Registered

 4   Professional Reporter, hereby certify:

 5        That I am a court reporter for Pacific Rim

 6   Reporting and Notary Public for the State of Alaska;

 7   that the foregoing proceedings were taken by me in

 8   Stenotype Shorthand and thereafter transcribed by me;

 9   that the transcript constitutes a full, true and

10   correct record of said proceedings taken on the date

11   and time indicated therein.

12        Further, that I am a disinterested person

13   to said action.

14        IN WITNESS WHEREOF, I have hereunto

15   subscribed my hand and affixed my official seal this

16   _____ day of _____, 2006.

17

18

19                         GAIL RUTH PECKHAM, RPR,

20                         and Notary Public for the

21                         State of Alaska

22

23

24                         My commission expires:  3-26-10

25
```