EXHIBIT  C

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    _____

                                                  )
4    JOE W. WILLIAMS,                             )
                                                  )
5                 Plaintiff,                      )
                                                  )
6         vs.                                     )
                                                  )
7    FEDEX GROUND PACKAGE SYSTEMS,                )
     INC., an Alaska corporation,                )
8                                                 )
                  Defendant.                      )
9    _____)

     Case No. A05-0192 CV (JKS)

10

11

12

     _____
13

                DEPOSITION of JOHN HOWARD THOMPSON

14   _____

15

16

17              Pages 1 - 172, Inclusive

18              Friday, March 31, 2006,

19                   10:02 a.m.

20

21

22        Taken by Counsel for the Defendant
                         at
23           Tindall Bennett & Shoup, PC
           508 W. 2nd Avenue, 3rd Floor
24            Anchorage, Alaska  99501

25

Page 2

```
 1                    A-P-P-E-A-R-A-N-C-E-S

 2

      For the Plaintiff:

 3

          Isaac D. Zorea and Moshe C. Zorea

 4        MOSHE CALBERG ZOREA & ASSOCIATES
          7540 E. 17th Avenue

 5        Anchorage, Alaska   99504
          (907) 337-7741

 6

 7

      For the Defendant:

 8

          Katheryn Bradley

 9        JACKSON LEWIS LLP
          One Union Square

10        600 University Street, Suite 2900
          Seattle, Washington 98101

11        (206) 626-6405

12

      Also present:   Joe W. Williams

13                    Steven Mondragon

14

      Court Reporter:

15

          Gail Ruth Peckham, RPR

16        Registered Professional Reporter
          PACIFIC RIM REPORTING

17        711 M Street, Suite 4
          Anchorage, Alaska   99501

18        (907) 272-4383

19

20

21

22

23

24

25
```

Page 3

1                          I-N-D-E-X

2

3

EXAMINATION BY                                      PAGE

4

     Ms. Bradley                                      5

5    Mr. Isaac Zorea                                 134

6

7

8

EXHIBITS

9

2    SUBPOENA AND NOTICE OF DEPOSITION OF JOHN        5

10   THOMPSON Case No.: A05-0192 CV (JKS)
     (5 pgs.)

11

3    COMPLAINT Case No. 3AN-04-00295 SC              11

12   (2 pgs.)

13

4    AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT       26

14   (2 pgs.)

15

5    FedEx Ground CONTRACTOR/DRIVER INFORMATION       31

16   SHEET (3 pgs.)

17

6    POMERANTZ Staffing Alternatives "EMPLOYEE        33

18   APPLICATION" (4 pgs.)

19

7    DRIVER'S RECEIPT (1 pg.)                         35

20

8    OPERATING AGREEMENT Last updated 02/17/01        36

21   (102 pgs.)

22

9    Letter to To Whom It May Concern from Steve      64

23   Mondragon January 3, 2001 (1 pg.)

24

25

Page 4

1  EXHIBITS CONTINUED

2

    10    Composite: Memorandum to TM/ANAK - 995     108
3        from Carol Dubbs 03/25/02 Subject: Approval
            Supplemental Van; with attachments. (4 pgs.)
4

    11    FedEx Ground, Inc. CONTRACTOR EMPLOYMENT/    110
5        BUSINESS REFERENCE QUESTIONNAIRE AND
            ALCOHOL AND DRUG TEST VERIFICATION re Joe
6        W. Williams (1 pg.)
7

    12    FedEx Ground RECORD OF ROAD TEST (SAFETY    113
8        RIDE) re Joe Williams (3 pgs.)
9

    13    C.A.R.E. PROGRAM CCS REIMBURSEMENT FORM    114
10       Date of Complaint: 09/10/02 (2 pgs.)
11

    14    Protective Insurance Company Request For    117
12       Additional Insured Status ICN: John H.
            Thompson (1 pg.)
13

    15    Letter to Dear Mr. Thompson from Jacqueline    129
14       J. Justice June 3, 2003 (1 pg.)
15

    16    CONTRACTOR'S DRIVER/TEMPORARY DRIVER    130
16       TERMINATION NOTICE Date 10/14/02; with
            e-mail to Laura Forsmark from Nicole
17       Gilmore 10/15/2002. (1 pg.)
18

    17    SETTLEMENT AND RELEASE OF ALL CLAIMS    132/170
19       Case No. 3AN-04-11527 CI (4 pgs.)

20

21

22

23

24

25

```
 1              ANCHORAGE, ALASKA, FRIDAY, MARCH 31, 2006

 2                            10:02 A.M.

 3                             -o0o-

 4                    P-R-O-C-E-E-D-I-N-G-S

 5              (Exhibit 2 marked.)

 6                    JOHN HOWARD THOMPSON,

 7         Deponent herein, having been duly sworn,

 8            was examined and testified as follows:

 9              MS. BRADLEY:  Mr. Thompson, we met earlier.

10    My name is Katheryn Bradley.  I'm the attorney for

11    FedEx Ground in this lawsuit.  And we just completed

12    your records deposition, and now I would like to take

13    your deposition as a fact witness.

14                            EXAMINATION

15    BY MS. BRADLEY:

16         Q.   Are you here pursuant to a subpoena this

17    morning?

18         A.   I am.

19         Q.   All right.  And is Exhibit 2 the subpoena

20    that you received that brought you here this morning?

21         A.   It looks like it, yes.

22         Q.   Do you understand that the purpose of this

23    deposition is to take your best testimony under oath

24    relating to the claims that Mr. Williams has brought?

25         A.   I do.
```

Page 14

1    yourself, without legal counsel?

2        A.   I believe so.

3        Q.   Did you, at one time, consider filing suit

4    against FedEx Ground?

5        A.   Yes, I did.

6        Q.   And why did you choose not to?

7        A.   Not deep enough pockets, not enough

8    contractors in the state, as in California's class

9    action suit.  And, quite frankly, I just want to move

10   on with my life and not have this go on in my life

11   for the next ten years.  I couldn't win, and I just

12   wanted to carry on.

13       Q.   Why couldn't you win?

14       A.   Didn't have enough money.

15       Q.   Have you ever filed bankruptcy?

16       A.   No.

17       Q.   Are you currently working?

18       A.   Yes.

19       Q.   What are you doing?

20       A.   I'm a member of the operators union.  And

21   we're getting ready to start back up construction.

22   And I have a small -- I'm self-employed, and I do

23   snow removal.

24       Q.   And what is the name of your business?

25       A.   Thompson & Associates.

Page 15

1      Q.    And is that the same business that you used
2  to provide services to FedEx Ground?
3      A.    It is.
4      Q.    Have you been doing snow removal -- let me
5  start over.
6            When did you start your snowplowing or snow
7  removal business?
8      A.    It would have been 14 years ago, 15 years
9  ago.
10     Q.    And that was under the name of Thompson &
11  Associates during the entire time?
12     A.    No, started out as Thompson Leasing.
13     Q.    All right.  Was that an Alaska corporation?
14     A.    No, sole proprietorship.
15     Q.    Is Thompson & Associates a sole
16  proprietorship, as well?
17     A.    Correct.
18     Q.    Did you do snow removal while you had a
19  contract with FedEx Ground?
20     A.    I did.
21     Q.    Did Joe Williams also work for you in that
22  business?
23     A.    He did.
24            And under the -- in the expandable folder
25  that I have given you, it also contains, as part of

Page 16

1    that operation, Mr. Williams' billing for the snow

2    removal.  And to the best of my recollection, he

3    actually worked both ends; he sometimes worked the

4    ground shuttle, and I believe there was an overlap

5    during the winter season that he also did snow

6    removal.  And that's how Joe Williams and I met.

7         Q.    You met when you worked with him on the

8    snow removal business; is that right?

9         A.    Yes.

10        Q.    All right.  Was he an employee of yours?

11        A.    No.  He was a subcontractor.

12        Q.    Did you have a written agreement with him,

13   with respect to how he would be compensated for the

14   snow removal services?

15        A.    Not to the best -- no, I don't believe so.

16        Q.    How was he compensated for snow removal

17   services?

18        A.    It was an hourly basis, to -- to rent his

19   snowplow, for him to take care of the properties that

20   I asked him to take care of for me.

21        Q.    Were these residences that required snow

22   removal that you serviced?

23        A.    Commercial.

24        Q.    Commercial parking lots?

25        A.    Correct.

```
 1        Q.    It was your intent to pay him under that
 2   business name?
 3        A.    That's correct.
 4        Q.    What do you know about the J.W.W. Trucking
 5   business?
 6        A.    That it was Joe Williams' business, and
 7   that he operated underneath that name.
 8        Q.    Were there any other partners in that
 9   business?
10        A.    I have no infor -- never had any
11   information on that.
12        Q.    Does J.W.W. Trucking have any employees?
13        A.    I have no information pertaining to that
14   question.
15        Q.    I take it, that wasn't a joint venture with
16   you and Mr. Williams?
17        A.    No, ma'am.  That was Mr. Williams' separate
18   business.
19        A.    Yes, ma'am, as far as I know.
20        Q.    When did you begin your relationship with
21   FedEx Ground?
22            Well, FedEx would have probably better
23   records than I have in front of me.  But I believe
24   I have a contract here that states 5/20/02.  But
25   that -- no.
```

1          June 4th 2000, it looks like.

2     Q.    How did you learn about the opportunity to

3  contract with FedEx Ground?

4     A.    Well, I think the first time I saw -- was

5  an ad in the paper that they ran, and saw that they

6  were interviewing.

7     Q.    Did you show up for the interviews?

8     A.    Yes, I did.

9     Q.    Where were those interviews?

10    A.    I believe at the Holiday Inn Express on

11  Spenard Road.

12    Q.    Was Peter Ricks the person you met, as the

13  representative of FedEx Ground, when you went to that

14  interview?

15    A.    That's correct.

16    Q.    And did Mr. Ricks explain what FedEx Ground

17  was looking for, in terms of contractors?

18    A.    He did.

19    Q.    What did he tell you?

20    A.    That FedEx Ground was looking for some

21  ground contractors to start up in Anchorage, Alaska.

22  And there was a whole presentation, that lasted

23  probably four- to six-hours long, that explained the

24  FedEx story, FedEx Ground story, and how the business

25  operated.

1    in the field.  He said:  Sign here, sign here, sign

2    here; carry on.

3         Q.    But he had already gone over the terms of

4    the agreement during the four- to six-hour

5    presentation, hadn't he?

6         A.    To the best of my recollection.

7         Q.    Now, the operating agreement, that's been

8    marked as Exhibit 8, is not the document that you

9    signed in the field, is it, because it contains

10   addendums since that time; isn't that correct?

11        A.    To the best of my memory, I signed this

12   operating agreement, or possibly -- I think it was

13   the operating agreement, and I think he brought it

14   all out and went:  Sign here, sign here, initial

15   here, initial here; carry on.  It may not have been

16   the complete -- it could have been -- well, we have,

17   under the signature page, P&D Contractor Operating

18   Agreement, he says it's 6/4 at the top, and he says I

19   signed it 5/29.  So there may have been a couple

20   different signing --

21        Q.    Before you lose that page, Mr. Thompson,

22   tell me which page you're looking at.  There's a

23   document number in the right-hand corner.

24        A.    D10166.

25              But at the top it says dated 06/04; at the

1    bottom it says, "Date current contract was signed."

2    But then, as you can note, underneath the -- his

3    signature and my signature, it's dated 5/29.

4         Q.    And Mr. Thompson, before you leave that

5    page, I just want to make sure I'm on the same --

6    have the same understanding as you.

7              The page that's marked D10166, isn't that

8    an addendum that's dated June 4th of 2001?

9         A.    Okay.  Looks like it.

10        Q.    So what I'm asking is, isn't this the full

11   contract, with the addendums, through the time that

12   you worked as a contractor for FedEx Ground?

13        A.    As I'm going through it, I see that's

14   correct.

15        Q.    So there are pages in here that were signed

16   subsequent to the initial contract; isn't that right?

17        A.    I don't understand your question.

18        Q.    Let's turn to page D10168.

19        A.    10168?

20        Q.    Yes.

21        A.    Okay.

22        Q.    Now, that page says that it's the RPS, Inc.

23   Pick-up and Delivery Contractor Operating Agreement;

24   isn't that correct?

25        A.    That's correct.

1      Q.   Isn't the agreement -- or the pages that

2  follow that page, doesn't that represent the

3  agreement that you signed in June of 2000?

4      If you would like a moment to look through

5  it, I'm happy to give that to you.

6      A.   Yes.  This looks like the first contract

7  that I signed, because we were operating under RPS,

8  when they first came to Alaska.  So that would be

9  correct.

10      Q.   And in June of 2000, isn't that when FedEx

11  Ground took over the operations of RPS, or started

12  taking over the operations right around that time?

13      A.   I believe so.

14      Q.   And I think you recognize that there was

15  some need for Mr. Ricks to get the contracts in

16  order, because there were changes happening at that

17  time?

18      A.   I do.

19      Q.   Your contract with FedEx Ground was

20  assumed -- or FedEx Ground assumed the contract with

21  RPS; isn't that correct?

22      A.   Yeah.  They bought RPS, and then it took a

23  while to get everything branded and -- and turn --

24  and operate as FedEx Ground, correct.

25      Q.   So the contract I'm looking at, that starts

Page 50

1    terminal manager; and thank you so very much for
2    bringing all this up.
3            Well, we hit a pretty heavy peak season,
4    and everybody was having problems with service, but I
5    was the one that was singled out.
6            And not only were we having problems
7    meeting the service, my company was still losing
8    money.  So I actually dropped my supplemental, went
9    and got another job and was pouring money from my
10   other job into this business, to try to keep it
11   afloat, until I could get some assistance from
12   management and get it back on a good paying basis.
13       Q.   When you said a moment ago that you dropped
14   your supplemental, you don't mean that you dropped
15   doing the route altogether, do you?
16       A.   The supplemental, it's kind of an
17   empty-shell thing.  If you -- when your route gets a
18   little bit bigger, you can go ahead and they'll let
19   you bring another truck in.  But you don't get all
20   the stuff that the main route gets, like they don't
21   pay -- all they pay you for is a much-diminished
22   amount.  So it's pretty much a losing deal; it
23   doesn't make any -- any money.
24           And Steve could certainly explain the
25   supplemental pay much better than I could.  But it

1    had to go get another job and pour money back in and

2    help support myself.

3         Q.    And in fact, you terminated Mr. Williams'

4    employment, didn't you, because you thought you could

5    keep the business afloat by doing that route

6    yourself?

7         A.    Generally, that's correct.  I needed -- my

8    company was going down, and I needed to be proactive

9    and do all I could do to squeeze every dollar out,

10   until I could get some help and get the company back

11   on its feet, and had the vision of:  Okay, I'm going

12   to get some help here; we're going to reengineer, and

13   things are all going to look real good.

14             And I -- my first -- and I tried to express

15   that to Joe Williams, that I needed that back, and

16   could we work something out, and possibly this will

17   be a short-term arrangement.  But that didn't work

18   out.

19        Q.    Was he angry at you for terminating his

20   subcontract?

21        A.    He was as angry at me as I was at FedEx for

22   allowing me to get -- and not supporting me and

23   supporting my business and reengineering; and yes, he

24   was very disappointed, and I was very disappointed.

25             It was very upsetting for me.  I had known

1    Joe for a long time, and he'd always done me a good

2    job.  But I was in a position of watching the ship

3    sink or patch up a few holes.  And I was doing the

4    best I could as the management.

5         Q.    FedEx Ground didn't tell you to terminate

6    Mr. Williams' contract, did it?

7         A.    No, they didn't.

8         Q.    Under your operating agreement with FedEx

9    Ground, you could operate more than one vehicle,

10   couldn't you?

11        A.    Correct.

12        Q.    And you could hire employees that were

13   qualified to meet the federal and state safety

14   standards; isn't that correct?

15        A.    I'm sure there's probably a provision in

16   there.  But that's not the way Peter Ricks wanted

17   things to go.  He wanted you to have subcontractors.

18   And he pretty much sold that bill of goods, that:

19   You know, you can't afford the insurance, you can't

20   afford the workman's comp; but get them as

21   subcontractors, and we'll get them under the

22   worker -- work accident insurance so you don't have

23   to do workman's comp; and we're going to provide the

24   insurance for the truck, and it's going to come right

25   out of your settlements.  And that's pretty much his

1    theory in that direction.

2        Q.    You decided to use subcontractors to

3    provide the services under the contract, didn't you?

4        A.    You have to understand, that when you're

5    working in this culture, you don't -- as what

6    happened to me, at the end, is because I then started

7    taking that stand:  That this is my business; I need

8    help with it; you guys got to do this.  And if you

9    don't play the game, it -- it doesn't really work out

10   for you.  It gets real -- there's an internal

11   atmosphere that's based around:  This is how we want

12   it done; we're not telling you that you have --

13   that's the way we want it done.  But things get very

14   unpleasant.  You don't get the help; you don't get

15   the support; you don't -- bottom line is, they'll

16   just cancel your contract.  So you put on their

17   uniforms; you show up at the time they tell you:

18   You're really not -- not our employee, but you've got

19   to show up here, and you've got to do this; can't end

20   before that.  They control you.

21       Q.    Did FedEx Ground tell you that you had to

22   hire Mr. Williams --

23       A.    No, he -- they certainly didn't.  It was an

24   opportunity that I saw, and I went ahead and got that

25   opportunity.

1          It was part -- the shuttle route that Joe

2    Williams ran was a part of another route.  I was

3    already really busy, and so I really had no time or

4    inclination to take over that shuttle route.  And so

5    I made that agreement with Joe Williams.

6          Q.  Did I understand your testimony earlier

7    today that you've always had subcontract arrangements

8    with people that worked in your business, Thompson &

9    Associates?

10         A.  As a general rule, I would have, previous

11   to FedEx Ground, mostly subcontractors.  There may

12   have been an occasional day laborer, but it wasn't

13   until recently, in my storm move, that I needed

14   employees.  But during FedEx Ground, I don't believe

15   I had any employees, it was all subcontractors.

16         Q.  So you used subcontractors to provide

17   services through your business Thompson & Associates

18   both before and after you had your contract with

19   FedEx Ground; isn't that right?

20         A.  That's correct.

21         Q.  I'd like you to turn to page D10182.

22         Do you see the paragraph that is numbered

23   2.2, Employment of Qualified Persons?

24         A.  I do.

25         Q.  Doesn't that paragraph state that any

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 63

1    persons had with FedEx Ground?

2        A.    Peter and Jacqueline were senior terminal

3    managers.  And I'm not sure what Steve's title was,

4    but he was basically assistant manager.

5        Q.    Did he later become the senior manager, do

6    you know?

7        A.    I -- I have no idea.

8        Q.    How often did you talk to Mr. Ricks, during

9    the time he was employed as senior manager by FedEx

10   Ground?

11       A.    Almost daily.

12       Q.    What did you talk to him about?

13       A.    Packages; boxes; stops; washing the vans;

14   the daily operating considerations and problems;

15   victories.

16       Q.    Did Mr. Mondragon write you a letter of

17   support, to assist you in getting routes with FedEx

18   Ground?

19       A.    I believe he did.

20       Q.    Did you ask him to do that?

21       A.    Could have.  I'm not sure how I put it, but

22   those were pretty happy times back then, so I might

23   have said something like:  That would help.  Or he

24   maybe even volunteered.  I'm not sure.  Could have

25   said something like:  Everything's going good.

WILLIAMS v. FEDEX

```
 1    for deliveries, and then there were times and places
 2    that FedEx desig -- Ground -- FedEx Ground designated
 3    that you had to be at certain times for pickups.
 4         Q.    Didn't certain customers ask that you pick
 5    up at a certain time during the day?
 6         A.    They told FedEx Ground, and FedEx Ground
 7    told us.
 8         Q.    Did you decide to use the supplemental van?
 9         A.    I believe as the -- it was my decision,
10    yes.
11         Q.    And that was for the Kenai-Soldotna
12    shuttle?
13         A.    No.
14         Q.    What was the supplemental van for?
15         A.    The supplemental was for the mountain area.
16    So I bought a smaller vehicle that could get up the
17    Hillside, four-wheel drive, box on the back, to take
18    care of the residentials that had long driveways and
19    difficult roads.
20         Q.    Okay.  And you decided that was the way to
21    handle that because of the weather conditions?
22         A.    Peter Ricks and I discussed the options and
23    came upon that.
24         Q.    How did the shuttle run to Kenai-Soldotna
25    come about?
```

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 70

1      A.    One of the other contractors -- and I don't

2    remember -- FedEx management can certainly provide

3    you with the exact reason that he had lost his route.

4    And I believe it was because of accidents.  So that

5    route became available and that shuttle route became

6    available.  And I applied for those routes, put

7    together a business plan and was awarded those

8    routes; that route, with the shuttle attachment.

9      Q.    The shuttle wasn't actually a route, in

10   itself, was it?

11     A.    No, it was not.  It was a completely

12   different animal.

13     Q.    Is Larry Gonzalez the contractor who had

14   been performing...

15     A.    That sounds correct.

16     Q.    Let me finish my thought.

17           He was the one who had the contract with

18   FedEx Ground for the Kenai-Soldotna shuttle run,

19   before you obtained that route; is that right?

20     A.    FedEx Ground management would be able to

21   provide much more detail; but to the best of my

22   recollection, that sounds right.

23     Q.    Now, describe for me the shuttle run

24   between the Anchorage terminal and Kenai-Soldotna.

25   Was it like the other runs?

WILLIAMS v. FEDEX

1        A.    There was no other runs like the Kenai run.

2        Q.    Did it involve a single pickup and delivery

3    to a spot in Soldotna?

4        A.    Consisted of all the packages, starting at

5    the Anchorage terminal, loaded into the truck, and

6    then delivered to the drop-off storage area that

7    FedEx Ground provided for the contractor in Kenai.

8        Q.    Was it a U-Haul drop-off down there, a

9    U-Haul storage area?

10       A.    I do not remember.

11             FedEx Ground personnel would be able to

12   provide that information to you.

13       Q.    Did you ever do the shuttle run yourself?

14       A.    I did.

15       Q.    Did that ever change, at any time, the

16   location that the drop-off and pickup occurred?

17       A.    I do not know.  I wasn't involved with the

18   shuttle operation.  I worked a completely different

19   shift.  That was left in the hands of Steve and Peter

20   Ricks.  I worked in the morning and was usually gone

21   by 3:00 or 4:00, and the shuttle run was run at

22   night, and had to be down there by -- I don't know --

23   7:00 a.m. or something.  And he could only leave --

24   he was directed that -- we had -- between my routes,

25   I had to pick up all of the packages at the airport,

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 72

1    and the shuttle was directed that it could not

2    leave un -- and I had to be there after 5:00 p.m. at

3    the airport -- one of my personnel had to be at the

4    airport at 5:00 p.m. or afterwards, and the shuttle

5    run could not leave until those packages -- or an

6    all-clear no-packages communication was received.

7        Q.   With respect to the packages that came from

8    the airport and needed to be delivered on the Kenai

9    Peninsula, when was the time by which those packages

10   had to be delivered?

11       A.   All packages -- again, FedEx Ground

12   personnel could give you that information.  I don't

13   know.

14            Our job was to pick up the packages that

15   were dropped off at the airport, get them to the

16   terminal, get them on the shuttle.  The shuttle then

17   dropped them off in Kenai, and the other contractor,

18   then, was on his own.  I have no information on how

19   that -- what they gave him, time line.

20       Q.   And the question I was asking you was did

21   FedEx dictate when you had your driver deliver the

22   packages to the Soldotna drop off.  Did they say it

23   had to be there by seven o'clock at night?

24       A.   I'm sure -- because whenever he had to

25   start, that had -- it had to be set in morning.  It

WILLIAMS v. FEDEX

1   obviously had to be there in the morning, for that

2   contractor to get there.  So yes, I'm sure that they

3   gave direct numbers to Joe Williams, that he had to

4   have those packages there by this amount of time,

5   because that contractor's got to show up and start

6   his day.

7        Q.   Do you have any specific recollection of a

8   time line set by FedEx Ground for the shuttle run?

9        A.   The only -- the only specific that I was

10  involved with was the five o'clock pickup at the

11  International Airport had to be done, and those

12  packages had to be to the shuttle, or an all-clear

13  no-package deal communication, and he couldn't leave

14  before then.  That's the only specific time line

15  I have.

16       Q.   You had a proprietary interest in the

17  routes, under the contract with FedEx Ground, didn't

18  you?

19       A.   I believe that's correct.

20       Q.   Let's look at page D10225 of the operating

21  agreement, Exhibit 8.

22       A.   What's that again?  D1022...

23       Q.   10225.  Uh-huh.

24            Is that addendum number 5, which sets forth

25  the proprietary interest?

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 77

1        A.    No written agreements, except what was

2   provided by FedEx Ground.

3        Q.    You provided your drivers with the vehicles

4   that they used, with the exception of Mr. Williams;

5   isn't that right?

6        A.    That's correct.

7        Q.    Why did you ask Mr. Williams to buy the van

8   that he used for the route under the contract?

9        A.    I basically wanted Mr. Williams to be a

10  stand-alone entity.  I was already stretched to the

11  limit.  I was very busy.  I didn't want anything to

12  do with the shuttle.  I knew his situation.  He was

13  working construction, and he had a son, and he wanted

14  to be with his family, have a more set operation.  So

15  we both came to the conclusion that that would be

16  really good.  I just wanted about $100 a week, and he

17  could just take all of it, and it would all be his:

18  So run it the way you want to run it; I am too busy,

19  I just got these other routes.  And so that's the

20  agreement that we had.

21           As far as requiring -- why I may have

22  required him to buy a truck, I may not have been in a

23  financial position, as I was already stretched to the

24  limit.

25       Q.    FedEx Ground didn't tell you how to set up

WILLIAMS v. FEDEX

1 that arrangement with Mr. Williams, did they?

2   A. No, they didn't. They -- they just

3 required bas -- him -- he had to talk to them about

4 what kind of truck he could get approved to run. But

5 they did not force me to do that; I don't have any

6 know -- any memory of that.

7   Q. FedEx Ground didn't tell you how much to

8 pay Mr. Williams, did they?

9   A. No. They didn't tell you how much to pay

10 anyone.

11   Q. So do I understand from your testimony that

12 you and Mr. Williams reached an agreement that he

13 would receive, as compensation for driving the

14 shuttle run to Kenai, whatever you received under

15 your contract with FedEx Ground less $100 a week?

16   A. I think that was our agreement. It might

17 have been $150, but I -- it -- others would -- I

18 don't remember. And I had a bookkeeper taking care

19 of the amount, so -- but that's the basic terms.

20   Q. What was the $100 or $150 deduction

21 intended to cover?

22   A. Just paperwork, bookkeeping. There was a

23 lot of paperwork generated.

24   Q. Are you sure that it was a deduction on a

25 weekly basis rather than a monthly basis?

WILLIAMS v. FEDEX

```
 1    under the support pack -- business support package.
 2    I had to pay for them.
 3         Q.    Right.
 4              Isn't it true, under the operating
 5    agreement, Exhibit 8, that in order to provide those
 6    tools to the drivers that were under your contract,
 7    you paid for all of those tools?
 8         A.    A rental fee, if you want, a weekly fee,
 9    the fee that they told me I had to pay:  And this is
10    what this costs, this is what this costs, this is
11    what this costs; you have to take this, you have to
12    take that and you have to take that.
13         Q.    You testified earlier that your arrangement
14    with Mr. Williams was he would be paid whatever you
15    received under your contract with FedEx Ground for
16    that shuttle run to Soldotna-Kenai less the $100.
17              Were there any other terms of your
18    agreement with Mr. Williams that addressed
19    compensation?
20         A.    Not that I'm aware of.
21         Q.    Did you ever give him an increase in his
22    pay?
23         A.    I just -- his -- his increase or decrease
24    would be based on the shuttle compensation form,
25    depending on, I believe, packages and mileage.  And
```

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 97

1          Q.    Wasn't the decision to have the FedEx
2     airport pickup and delivery part of Mr. William's
3     route your decision?
4          A.    My decision?  My decision to hold the truck
5     up for five o'clock?  It was a pain.  I fought
6     bitterly against it.
7          Q.    Couldn't you have another driver do that
8     part of it?
9          A.    Could -- those pack -- still, that shuttle
10    had to wait until 5:00 p.m.  We tried a couple
11    different systems, but we were falling behind.
12    It was difficult.  We had service problems that were
13    all the -- so the guy downtown, to run out there to
14    the airport and run to the -- it was logistically
15    difficult.
16         Q.    If you had wanted to have somebody else do
17    that airport FedEx Express run, didn't you have the
18    discretion to do that?
19         A.    There's -- you have a lot of discretion,
20    but you have to look at everything -- it's --
21    financially, also.  It's got to fit together.  You
22    can't -- if you're going to be a successful ground
23    contractor, the financial implications have to be
24    considered as valid decision-making.  You can't
25    arbitrarily say:  Well, heck, let me get six more

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 98

1    supplemental trucks, and then we'll all have

2    100-percent delivery, and then only lose $750 a day.

3         So, yes, I could have decided to do that,

4    but there was no financial sense to it, as a business

5    owner.  And my responsibility was the big picture for

6    everyone; not just one route, it all had to work

7    together, or everybody was out of their jobs,

8    everybody was out of their contracts.

9         Q.    Because you were responsible for the

10   results under the contract, weren't you?

11        A.    As a contractor, that's correct.

12        Q.    Do I understand correctly from your

13   testimony that all of your drivers were -- or

14   subcontractors, that it was up to them when they

15   would stop to eat lunch, for instance?

16        A.    I was lucky to have a good group of

17   contractors.  I had an ex-FedEx Express guy and some

18   other people that took -- they were very

19   conscientious.  But that is correct.  When they left

20   in the morning, their day was theirs:  How they ran

21   the route, when they stopped for lunch...

22        Q.    How many hours they took doing it?

23        A.    How many hours they took doing it, correct.

24        Q.    If they wanted to take an hour lunch, that

25   was okay, as long as they met their obligations under

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 99

1    the -- delivered the packages on the route?

2         A.    That's correct.

3         Q.    Did you keep track of when they took lunch

4    hours or breaks, or anything like that?

5         A.    Never had a clue.

6         Q.    Did you explain that to your drivers, that

7    that was up to them?

8         A.    Absolutely.

9         Q.    How long have you known Mr. Williams?

10        A.    Oh, a pretty long time.  His I believe it's

11   cousin was best man at my wedding.  And then I

12   think -- that was in 1970.  I probably met Joe in the

13   '80s, mid '80s.  We worked together on another

14   construction job.  He was a truck driver - I was an

15   operating - up in Fairbanks.  Kind of on-again,

16   off-again, until we started working in the late --

17   late '90s -- he started plowing snow for me.

18        Q.    Did you consider yourself friends during

19   that time?

20        A.    Right up to the point that I had to take

21   the route back; yes, I did.

22        Q.    Was he working for you in the snowplowing

23   business before he started working for you on the

24   FedEx Ground contract?

25        A.    He did.

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 101

 1    into his lifestyle, I approached him, because I knew

 2    he was a hard worker, and said:  Hey, you want to get

 3    out of this feast-or-famine thing; I think I found

 4    something here.

 5         Q.    Did you tell him how much you were making?

 6         A.    I think we concentrated pretty much on

 7    the -- we probably had a little conversation about

 8    it, that I thought it was successful and something to

 9    build; and there was no salesman here, so we had a

10    chance to be on this ground floor, as this great

11    ground swell of growth happened; would be kind of the

12    general things I would say to him.  But I'm sure I

13    found out then, or shortly thereafter -- I'm sure his

14    first question was:  Well, how much money am I going

15    to make?  So I needed to go to the terminal and say:

16    Well, what are we looking at right now?

17         Q.    Uh-huh.

18         A.    So I'm sure we discussed income.

19         Q.    Did you tell him that you were an

20    independent contractor for FedEx Ground?

21         A.    I told him the general -- I'm sure that I

22    told him the whole general setup.

23         Q.    Do you recall where you were, when you

24    reached the agreement to pay him that you've

25    described earlier today?

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 102

1       A.    No.

2       Q.    Do you recall any other circumstances,

3    other than what you've testified to, that there is no

4    written agreement and...

5       A.    I believe I've testified that I'm -- I'm

6    unaware, and to the best of my recollection, we did

7    not have a written agreement.  We may have.  And Joe

8    may be able to -- the only thing that I could find

9    was the subcontractor's and the work accident

10   insurance form required by FedEx Ground.

11      Q.    All right.  Did you tell Mr. Williams that

12   you were acting on behalf of FedEx Ground, when you

13   entered into that agreement with him?

14      A.    I was a FedEx Ground contractor, so that's

15   a possibility.  But it was -- I wanted to be

16   hands-off.  I didn't want to be involved.  So it was

17   pretty much:  Here, this is yours, minus the $100, go

18   see what's all involved, there's Mr. Ricks, he'll

19   tell you what's going on; this is Joe, he's a great

20   hard worker, he's going to buy a truck, he's going to

21   take over the shuttle; you guys go take care of it.

22      Q.    But you were being compensated for the

23   services that you provided, weren't you?

24      A.    The services that he provided, as I

25   previously stated, were included in my 123-5

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 108

```
 1              (Exhibit 10 marked.)
 2   BY MS. BRADLEY:
 3       Q.   Mr. Thompson, you've been handed what's
 4   been marked as Exhibit 10.
 5            Is this the paperwork that you completed to
 6   get Mr. Williams' van approved.
 7       A.   No, it isn't.
 8       Q.   What is this?
 9       A.   This is the paperwork that Peter Ricks
10   filled out -- or Joe Williams, but I think it's Peter
11   Ricks, looking at the signature down at the bottom,
12   and looking at how he made his P's and his R's.  And
13   then looking up at the top, where it starts out, and
14   just looking at his handwriting, this would be Peter
15   Ricks writing this all out.  And then he would put
16   that in my slot, for me to sign it.  It doesn't look
17   like he had to go get pictures.  But this is Joe
18   Williams deciding that he wanted this -- or
19   submitting an application for approval for this
20   truck.
21       Q.   And the last page of that exhibit, isn't
22   that the specifications for the vehicle?
23       A.   It sure looks like it.
24       Q.   And isn't that your signature that appears
25   on page 2 --
```

WILLIAMS v. FEDEX

Page 109

```
 1        A.    Correct.

 2        Q.    -- where it says Contractor?

 3        A.    Correct.

 4              And as I previously stated, these kind of

 5     things would come into my slots, and Peter would make

 6     these things out, and they'd -- then they'd be -- we

 7     each had a basket, and in that basket was -- were our

 8     settlements or any notes from management.

 9              So Peter Ricks would fill these things

10     out -- or filled this out.  And he may have called.

11     I do not remember signing this, but I think that is

12     my signature.  He would have called me over and said:

13     Here, sign this; or leave it in my box.

14        Q.    All right.  So this is the process that was

15     used to get Mr. Williams' van approved when he bought

16     it, to serve as a driver for you under the contract?

17        A.    This is pretty much the process for all

18     trucks that are brought into the terminal.

19        Q.    During the time that Exhibit 10 was

20     processed and approved, you were at the terminal on a

21     regular basis, weren't you; on a daily basis, in

22     fact?

23        A.    Every morning, and then gone all day until

24     3:00 or 4:00 in the afternoon.  Once in a while, I --

25     if I couldn't get all my boxes onboard,
```

WILLIAMS v. FEDEX                                                    JOHN THOMPSON
                                                                      3/31/2006

Page 115

```
 1    represent to you this is the -- Exhibit 13 is a
 2    complaint from Mike at Johnson's Tire about
 3    Mr. Williams.
 4            Does this refresh your recollection, that
 5    there was a complaint about him?
 6        A.    Not really.
 7        Q.    Do you have any reason to believe this is
 8    inaccurate?
 9        A.    No, I don't have, one way or the other.  It
10    could -- we -- we -- you know, I suppose if -- if I'd
11    have seen this, I probably would have chuckled,
12    and -- and been glad that it wasn't a customer that
13    had a service complaint -- and kind of feel his pain.
14    I could have felt Joe's pain, that he would have to
15    go get new tires because of FedEx rules, and I
16    probably would have skipped right over it.  I was
17    pretty focused on delivering of packages and
18    accidents, so...
19        Q.    Did you ask Mr. Williams to pay for the
20    tires?
21        A.    I think he had to pay for the tires,
22    because all I took out was the $100 for my
23    processing, bookkeeping fee.  And he had all of that:
24    He paid for his fuel; he paid for repairs; he paid
25    for decals; he paid for all those things.
```

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 116

1      Q.    And that was part of the agreement between
2    the two of you; isn't that right?
3      A.    The general agreement was that's his route,
4    and I get a service fee for doing some paperwork, and
5    all that that entails.
6      Q.    Did you lose any CCS money because of the
7    complaint that was made --
8      A.    That's a good question.
9      Q.    -- against Mr. Williams?
10     A.    Excuse me.
11          That's a good question.  FedEx Ground could
12   provide that for you.
13          My first instinct was how the -- the
14   shuttle was not a route.  I don't think so.  But
15   maybe.
16          By that time, things had gone a little
17   sour, and I may have been -- taken some CCS money.
18   They would take it for a lot of different reasons.  I
19   didn't keep close records on that.
20     Q.    What was CCS; do you know what it stood
21   for?
22     A.    No, I don't.  Customer Service -- it was a
23   bonus for if you got certain -- if you were a good
24   driver and you had good deliveries and kept the good
25   service, no complaints.  I think there was quite --

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 126

1      Q.    But it was your decision that Mr. Williams

2   couldn't continue, if you were able -- I mean for

3   financial reasons, he couldn't continue, in your

4   view?

5      A.    Exactly.

6      Q.    So ultimately, you made that decision, that

7   Mr. Williams couldn't continue as your driver?

8      A.    Exactly.

9           But I had to fight for it.  And I had to

10   fight -- not only those two meetings, but I had to

11   have a confrontation with Peter Ricks, where I got

12   downright ugly.

13     Q.    Why --

14     A.    He --

15     Q.    Why were you upset with him?

16     A.    Because he was telling me what I had --

17   could and couldn't do.  I was supposed to have this

18   contract; I was supposed to be a contractor, and here

19   he's put me into this horrible situation, that --

20   telling me I can't do this, and that he's not going

21   to let me do that.  And it wasn't until I threatened

22   to go -- and I had to do this quite of -- threaten to

23   go to the higher-ups in the regional, that he said --

24   well, he would say things:  Well, let me get on the

25   phone and see, and get a clarification.  Then he'd

1  come back and say:  Well, if that's what you have to

2  do, that's what you have to do.

3       Q.   Did you discuss anything else, in either of

4  the two meetings that you had with Mr. Williams and

5  Mr. Ricks?

6       A.   I think that was pretty much the main theme

7  of both meetings, was me taking the route back over.

8       Q.   Did Mr. Ricks accuse you of smoking

9  marijuana, at some point, during the time you had the

10  contract?

11       A.   No, actually, he did not.

12            There had been an episode on TV earlier,

13  and someone was -- from Outside had come in, and

14  I had taken up the disgusting habit of starting to

15  smoke Swisher Sweets.  Well, that happened to be the

16  cigar, that they had this television show, that

17  people were taking out the tobacco and putting

18  marijuana in.

19            So one bright and sunny day, when I came

20  back to the terminal, Peter Ricks says:  I just got a

21  call that you were smoking marijuana in the truck,

22  driving down the road in your big green uniform, with

23  big green FedEx all over it.  And I go:  Yeah, that

24  makes a lot of sense, doesn't it?  He goes:  What's

25  up?  I said:  Come here in my truck.  And there was a

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 128

1    pack of Swisher Sweets.  And we both kind of went:

2    Oh, yeah, right.  Like I got all this investment, and

3    I'm going to be popped going -- driving down the

4    road?

5           So that was that incident; it wasn't him

6    accusing me.

7       Q.    Okay.  So you were able to work it out with

8    Mr. Ricks to resolve that issue?

9       A.    We walked out to the truck, and he walked

10   back in the office and said:  Have a nice day.

11      Q.    Was it at that meeting that you advised

12   Mr. Ricks that Mr. Williams was no longer driving for

13   you?

14      A.    And what meeting?

15      Q.    The two meetings you've just been

16   describing.

17      A.    Well, it -- as I recall, it might have

18   taken a couple weeks from those meetings before I had

19   my ducks in a row, and kind of had a plan, and then

20   was able to beat through Peter Ricks' objections and

21   make that decision.

22      Q.    Who did you advise at FedEx Ground that

23   Mr. Williams was no longer driving for you?

24      A.    Peter Ricks.

25           I'm sure that -- or I would assume that he

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

Page 129

```
 1    shared that with Mr. Mondragon, and probably Nicki
 2    (ph), who --
 3         Q.    Is that Nicole Gilmore, when you say Nicki?
 4         A.    Yes.  Yeah.  Who was the front desk...
 5              I -- you know, word got around.  It was no
 6    secret.
 7         Q.    Was Nicole Gilmore responsible for
 8    notifying the corporate office that he was no longer
 9    driving for you?
10         A.    Mr. Mondragon would be able to answer all
11    FedEx Ground internal operations -- I have no
12    recollect -- no idea.
13              (Exhibit 15 marked.)
14    BY MS. BRADLEY:
15         Q.    Mr. Thompson, is Exhibit 15 the letter that
16    you received from FedEx Ground terminating your
17    operating agreement?
18         A.    It is.
19         Q.    And is that letter dated June 3rd of 2003?
20         A.    It looks like that to me.  My copy says
21    that.
22         Q.    When was Mr. Williams' arrangement with you
23    terminated?
24         A.    I do not recall; I do not have that date.
25         Q.    You testified earlier that you thought
```

Page 132

1          MS. BRADLEY:  Absolutely.

2          (Exhibit 17 referenced.)

3     BY MS. BRADLEY:

4          Q.   Is Exhibit 17 the settlement agreement that

5     you reached with Mr. Williams?

6          A.   This appears to be the settlement agreement

7     I reached with Mr. Williams.

8          Q.   Was that prepared by legal counsel?

9          A.   It was.

10         Q.   Do you understand that that settlement

11    agreement does not address any claims between FedEx

12    Ground and Mr. Williams?

13         A.   One more time.  I missed...

14         Q.   That agreement doesn't settle any claims

15    that relate to claims between Mr. Williams and FedEx

16    Ground, does it?

17         A.   Not that I am aware of.  But I'm not an

18    attorney.  But, no, it wasn't my understanding, when

19    we settled.

20         Q.   And likewise, it doesn't affect any claim

21    that FedEx Ground might have against you relating to

22    Mr. Williams, does it?

23         A.   On that issue, I believe that has been

24    settled, when the judge accepted this.  And that's

25    going to be between you guys, the attorneys, hashing

WILLIAMS v. FEDEX

JOHN THOMPSON
3/31/2006

171

1          CERTIFICATE OF REPORTER

2

3          I, GAIL RUTH PECKHAM, RPR, Registered

4    Professional Reporter, hereby certify:

5          That I am a court reporter for Pacific Rim

6    Reporting and Notary Public for the State of Alaska;

7    that the foregoing proceedings were taken by me in

8    Stenotype Shorthand and thereafter transcribed by me;

9    that the transcript constitutes a full, true and

10   correct record of said proceedings taken on the date

11   and time indicated therein.

12         Further, that I am a disinterested person

13   to said action.

14         IN WITNESS WHEREOF, I have hereunto

15   subscribed my hand and affixed my official seal this

16   _____ day of _____, 2006.

17

18

19

20         GAIL RUTH PECKHAM, RPR,

            and Notary Public for the

21         State of Alaska

22

23

24         My commission expires:  3-26-10

25