EXHIBIT  F

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3     _____
                                        )
 4     JOE W. WILLIAMS,                 )
                                        )
 5               Plaintiff,             )
                                        )
 6          vs.                         )
                                        )
 7     FEDEX GROUND PACKAGE SYSTEMS,    )
       INC., an Alaska corporation,     )
 8                                      )
                 Defendant.             )
 9     _____)
       Case No. A05-0192 CV (JKS)
10
11
12


13     _____

              DEPOSITION OF JOE WADE WILLIAMS
14     _____
15
16               Pages 1 - 236, Inclusive
17               Monday, April 3, 2006,
18                    9:13 a.m.
19
20
21         Taken by Counsel for the Defendant
                          at
22           Tindall Bennett & Shoup, PC
             508 W. 2nd Avenue, 3rd Floor
23             Anchorage, Alaska  99501
24
25
```

WILLIAMS v. FEDEX

Page 2

```
 1                A-P-P-E-A-R-A-N-C-E-S
 2
     For the Plaintiff:
 3
         Isaac D. Zorea and Moshe C. Zorea
 4       MOSHE CALBERG ZOREA & ASSOCIATES
         7540 E. 17th Avenue
 5       Anchorage, Alaska  99504
         (907) 337-7741
 6
 7
     For the Defendant:
 8
         Katheryn Bradley
 9       JACKSON LEWIS LLP
         One Union Square
10       600 University Street, Suite 2900
         Seattle, Washington 98101
11       (206) 626-6405
12
     Also present:  Steven Mondragon
13
14   Court Reporter:
15       Gail Ruth Peckham, RPR
         Registered Professional Reporter
16       PACIFIC RIM REPORTING
         711 M Street, Suite 4
17       Anchorage, Alaska  99501
         (907) 272-4383
18
19
20
21
22
23
24
25
```

WILLIAMS v. FEDEX

JOE WILLIAMS<br>4/3/2006

1                          I-N-D-E-X
2
3

EXAMINATION BY                                    PAGE
4
     Ms. Bradley                                    6
5    Mr. Isaac Zorea                              214
6

FURTHER EXAMINATION BY
7
     Ms. Bradley                                  229
8    Mr. Isaac Zorea                              233
9
10

THOMPSON EXHIBITS REFERENCED
11

12   10   Composite: Memorandum to TM/ANAK - 995   109
          from Carol Dubbs 03/25/02 Subject: Approval
          Supplemental Van; with attachments. (4 pgs.)
13

14   11   FedEx Ground, Inc. CONTRACTOR EMPLOYMENT/  97
          BUSINESS REFERENCE QUESTIONNAIRE AND
          ALCOHOL AND DRUG TEST VERIFICATION re Joe
15        W. Williams (1 pg.)
16

17   12   FedEx Ground RECORD OF ROAD TEST (SAFETY   40
          RIDE) re Joe Williams (3 pgs.)
18

19   16   CONTRACTOR'S DRIVER/TEMPORARY DRIVER      156
          TERMINATION NOTICE Date 10/14/02; with
          e-mail to Laura Forsmark from Nicole
20        Gilmore 10/15/2002. (1 pg.)
21

     EXHIBITS
22

23   18   POMERANTZ STAFFING SERVICES, LLC           35
          CONFIDENTIAL EMPLOYEE APPLICATION
          dated 01/31/2002 re Joe W Williams (1 pg.)
24

25   19   ACKNOWLEDGMENT OF TEMPORARY ASSIGNMENT     36
          dated 01/31/02 re Joe W. Williams (1 pg.)

WILLIAMS v. FEDEX

Page 4

1    EXHIBITS CONTINUED
2

20    RESPONSIBILITY PROGRAM dated 01/31/02          36
3     re Joe W Williams (1 pg.)
4

21    Composite: 2000 JWW Trucking Invoices          55
5     (32 pgs.)
6

22    THOMPSON & ASSOCIATES payment statements       55
7     Paid To: JWW TRUCKING (26 pgs.)
8

23    WELLS FARGO Bank Statements Acct. #201-         55
9     6987265 2001 (5 pgs.)
10

24    WELLS FARGO Bank Statements Acct. #201-         55
11    6987265 2002 (14 pgs.)
12

25    SUBCONTRACTOR ENROLLMENT FORM for Group        99
13    Independent Contractor Work Accident
      Insurance Policy No: 1A000001 re John
14    Thompson/Joe W. Williams (1 pg.)
15

26    CONTRACTOR/DRIVER INFORMATION SHEET dated     168
16    12/14/00 re Joe W Williams (4 pg.)
17

27    COMPLAINT AMENDED Case No. 3AN-04-11527 CI    173
18    (10 pgs.)
19

28    Form 1040 2002 Joseph W Williams 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 193
20    (10 pgs.)
21

29    Form 1040 2003 Joseph W Williams 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 193
22    (8 pgs.)
23

30    Form 1040 2004 Joseph W Williams 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 193
24    (11 pgs.)
25

WILLIAMS v. FEDEX

Page 5

1    EXHIBITS CONTINUED

2

     31    INITIAL DISCLOSURES BY JOE W. WILLIAMS      202
3           Case No. 3AN-04-11527 CI (2 pgs.)

4

     32    DEFENDANT FEDEX GROUND PACKAGE SYSTEM       202
5           INC.'S FIRST REQUESTS FOR ADMISSION
            Case No. 3AN-04-11527 CI (7 pgs.)

6

     33    DEFENDANT FEDEX GROUND PACKAGE SYSTEM       202
7           INC.'S INTERROGATORIES NOS. 1-9
            Case No. 3AN-04-11527 CI (13 pgs.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WILLIAMS v. FEDEX                                                                    JOE WILLIAMS
                                                                                         4/3/2006

Page 6

```
 1            ANCHORAGE, ALASKA, MONDAY, APRIL 3, 2006
 2                           9:13 A.M.
 3                             -oOo-
 4                     JOE WADE WILLIAMS,
 5          Deponent herein, having been duly sworn,
 6            was examined and testified as follows:
 7                          EXAMINATION
 8    BY MS. BRADLEY:
 9          Q.   Mr. Williams, I don't know that we
10    officially met.  But I'm Katheryn Bradley, and I'm
11    the attorney for FedEx Ground in this case.
12               And I know you were here at the deposition
13    on Friday of Mr. Thompson.  Was that the first time
14    you've participated in a deposition?
15          A.   Yeah, never seen one.  I was kind of
16    confused, and at least now I've seen a little bit of
17    the questions.
18          Q.   Okay.  So you know that the way it works, I
19    ask the questions, and then I'll expect you to give
20    me your best answer?
21          A.   Yeah.
22          Q.   And you understand that you're under oath
23    this morning?
24          A.   Yes, I do.
25          Q.   All right.  And do you understand that my
```

Page 155

```
 1    other delivery stuff that he had.

 2        Q.    Did you tell him that you wanted to

 3    continue driving?

 4        A.    No, I don't believe I did.

 5        Q.    What did you tell him?

 6        A.    I told him that's screwed up, if I remember

 7    right, and I says:  We'll see about this.  And I just

 8    left it at that.  I didn't scream or yell.  And then

 9    I believe -- I believe I was working the day he

10    called me, and I waited until the next day, and I

11    went in and talked to Peter about it, if I remember

12    correctly.

13        Q.    Do you remember the day that you received

14    the news from Mr. Thompson?

15        A.    The actual date of that day, no.

16        Q.    Do you recall the month?

17        A.    Nope.

18        Q.    Was it October of 2002; does that refresh

19    your recollection?

20        A.    I believe I worked another three weeks

21    after that, after he told me.  So probably go to the

22    last day I worked, and probably go about three weeks

23    before that.

24        Q.    Do I understand he gave you three weeks

25    notice, then, that he was terminating you?
```

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 156

```
 1      A.    No, he didn't give me no notice.
 2      Q.    Why did you work three weeks --
 3      A.    He said it was going to be done.
 4            Why?  Because Peter told me:  No, don't
 5   worry about it; I'm not going to let it go this
 6   way.
 7      Q.    But, ultimately, Peter Ricks wasn't able to
 8   change Mr. Thompson's mind, was he?
 9      A.    According to him, he could any time he
10   wanted to; he could at any time.  But he didn't do
11   it.  But he kept telling me that he could, and told
12   me that he'd get the FedEx thing for Fairbanks, or he
13   would turn it in, before he got rid of a valued
14   person in his company.
15            (Thompson Exhibit 16 referenced.)
16   BY MS. BRADLEY:
17      Q.    Mr. Williams, I'd like you to look at what
18   was previously marked as Exhibit 16.
19            Have you seen that document before?
20            (Off the record per reporter.)
21   BY MS. BRADLEY:
22      Q.    Mr. Williams, we had to go off record to
23   fix the tape.  And I had just handed you what's
24   marked as Exhibit 16 from Mr. Thompson's deposition.
25   And I was asking you whether you had seen this
```

Page 157

1   document before.

2       A.   I do not recall seeing this one before.  He

3   had told me on the phone -- this may have been handed

4   to me afterward.  I don't remember.  I don't remember

5   the exact date that I got there and -- I got there to

6   go to work, and was planning on working the day that

7   my truck was sitting out there, and I no longer had a

8   job.  So I don't know if they put that date -- if

9   this date was that date or not, I'm not positive.

10      Q.   When you said your van was sitting outside,

11  was that before or after the three weeks that you

12  kept on working?

13      A.   I don't know exactly on the three weeks.

14  But I was still working, and I was planning on

15  working that day.  When I got to work that day, the

16  van was parked in a place that it normally wasn't

17  parked.  So I'm like:  Hmm, okay, what's up?  And

18  that's when I found out.  I wasn't pre-told.  I went

19  there that day to work that day, and then I found

20  out:  Oh, well, I guess I don't work today.

21      Q.   You found out after --

22      A.   I had my uniform on and was ready to go to

23  work.

24      Q.   You found out after that, when Mr. Thompson

25  called you on the phone; is that right?

WILLIAMS v. FEDEX

Page 158

```
 1      A.    No.   This is when, I guess, that he went
 2   over Peter's head and got it stopped from me working.
 3      Q.    So --
 4      A.    Prior to this, I was still working.  Even
 5   though John didn't want me to, I was still working,
 6   because Peter said:  No, you don't have to; you can
 7   keep working.  So I kept working.
 8      Q.    Okay.  I'm just trying to get the sequence
 9   of events in my mind.
10            So by the time you showed up and your van
11   was parked outside, you already knew that John
12   Thompson was trying to terminate your contract,
13   didn't you?
14      A.    I knew he was trying to, yes.  I knew that
15   he wanted to take it over, but I knew that Peter had
16   told him no.  And I know that I had kept working,
17   because Peter told me that he was the ultimate one in
18   control.  And I had continued to work, because Peter
19   said:  No, you're going to keep working; I want to
20   keep you; I don't want to lose you.
21      Q.    Do you have any reason to believe that the
22   date that Mr. Thompson terminated your contract was
23   anything other than October 4th of 2002?
24      A.    October 14th, you mean?
25      Q.    Well, the date I see on this form, Date of
```

WILLIAMS v. FEDEX                                                JOE WILLIAMS
                                                                   4/3/2006

Page 159

```
 1   Termination, October 4th, 2002.
 2           Do you see that?
 3      A.   Submitted 10/14/02.
 4      Q.   Do you see the double-dotted line almost at
 5   the bottom?
 6      A.   Oh, date of termination.
 7      Q.   Date of termination, October 4th of 2002?
 8      A.   How could I be terminated at that date but
 9   not be submitted or nothing until ten days after
10   that?
11           Didn't it have to be submitted before you
12   could be terminated?
13      Q.   I don't know, Mr. Williams.
14      A.   I don't either.
15      Q.   I'm just asking you was this the date of
16   your termination?
17      A.   I don't know.  That's what that piece of
18   paper says, but it's got two different dates on it.
19      Q.   Well, it indicates that the date of the
20   termination was October 4th, but it looks like it was
21   submitted at a later date.
22      A.   Yeah.
23      Q.   Isn't that right?
24      A.   Yeah, it says submitted.  But it seems like
25   to me you'd have to submit something before you could
```

WILLIAMS v. FEDEX                                                        JOE WILLIAMS
4/3/2006

Page 160

1    act it.

2         Q.    Isn't this the internal paperwork that was

3    notifying the corporate office to take you off the

4    STTS?

5         A.    It's very possible.

6         Q.    Isn't that what it says?

7         A.    It's what it looks like to me.  I don't

8    fill these papers out.  I have no idea.

9              It's got part of John Thompson's Social

10   Security on there, and that's it.

11        Q.    And isn't that how FedEx Ground kept track

12   of Mr. Thompson's contract, was through his Social

13   Security number?

14        A.    I would hope they would have had his whole

15   Social Security number.

16        Q.    After Mr. Thompson called you and told you

17   he was terminating your contract, you mentioned you

18   spoke to Peter Ricks.  What did you tell Mr. Ricks?

19        A.    I went in and asked him:  What's going on;

20   we had an agreement?  And he says:  Well, I know.

21   And I says:  Well, have I been doing things wrong;

22   have I been holding my part of the agreement; have I

23   been delivering these boxes; has everything been

24   getting there on time; do you have any complaints of

25   that?  He goes:  No, I have no complaints of that;

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 161

1    you're doing a good job.  I said:  The only thing you

2    have that's anything was on a day I had off, and I

3    had a disagreement on the day I had off.  I said:  It

4    didn't have nothing to do with the company.  And he

5    goes:  I know.  He says:  You're a good person; I

6    want to keep you; that's why you continue to work.

7    He said he was going to work the Fairbanks run in --

8    or before he gave it to John, just gave it and kicked

9    me out with nothing, he was going to do one or the

10   other:  Either he was going to make it into a

11   contract and going to get me into the Fairbanks

12   thing, or was going to do something, not terminate me

13   just on John's request.

14        Q.   Did Mr. Ricks tell you that you had a

15   contract with Mr. Thompson and not FedEx Ground?

16        A.   We -- we made a verbal agreement.  We

17   had -- I had a verbal agreement with John Thompson

18   and Peter Ricks together.

19        Q.   I'm asking you what --

20        A.   I had no written contract with John

21   Thompson.

22        Q.   I understand.

23        A.   We had a verbal agreement together.

24        Q.   I understand that you believe you had a

25   verbal agreement at the beginning.

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 165

```
 1        Q.   Did Mr. Ricks say:  I'll pay you this much
 2   per hour?
 3        A.   He said he'd pay me so much until I got
 4   online.  You know, he said when -- until -- in the
 5   beginning.
 6        Q.   That was during --
 7        A.   He said that they'd pay so much.
 8        Q.   -- the Pomerantz time, right?
 9        A.   Well, that's what he said he would pay me.
10   And then later, we find out it wasn't even him,
11   it was another company.  But the original -- the
12   original talks was he was going to pay me so much,
13   until I got my truck online.  When I got my truck
14   online, then John says:  I'll pay you this much.  And
15   Peter says:  Okay, is that good?  And I said:  Yeah,
16   if he pays me that minus his $100 a week, I get the
17   rest.  Good, let's do it.  It's good.  All agreed by
18   all three of us?  Vehicle's agreed by all three of
19   us?  Let's do this.  And we went to work.
20        Q.   So the agreement on compensation was
21   between you and Thompson, right?
22        A.   Yes, with his approval.
23        Q.   Did you have a discussion with Mr. Thompson
24   about how long your contract would continue?
25        A.   Other than what we had talked to, together,
```

WILLIAMS v. FEDEX

1    that as long as I did my job right, the contracts
2    come up for renewal, as long as there was no - what
3    word did he use -- as long as there was no things
4    wrong done, there were - whatever they write up - no
5    write-ups, and this and that on me, as long as
6    I've done my job properly, there would be no reason
7    to terminate me; there would be no reason not to
8    continue to -- to work, if I was doing my job right.
9         Q.   After Mr. Thompson terminated your
10   contract, and you still had payments to make on your
11   van, what did you do to use the van for other
12   purposes?
13        A.   I never got anywhere.  I tried to get it on
14   a couple different jobs, and it wasn't the right type
15   of thing.  The only other thing I did was my sister
16   wanted to move, so I moved her.  Other than that,
17   didn't have any other work I found with it.  I used
18   it to go snowmobiling a couple of times.
19        Q.   Did Mr. Thompson offer to rent the van
20   from you, to drive on his -- on the shuttle run that
21   he was continuing?
22        A.   Yeah.  He offered to give me $500 a month.
23   And it cost me $700 a month for my truck payment.
24   And I told him that would not be adequate.
25        Q.   Wasn't $500 a month better than nothing?

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 179

```
 1    supposebly different, because of being a bulk shuttle
 2    run --
 3        Q.    Okay.
 4        A.    -- the way I was explained, and the way I
 5    understood it.
 6        Q.    What restrictions were placed on your
 7    vehicle, other than the America flag being removed
 8    and the need for your van to be parked so it could be
 9    loaded in the morning?
10        A.    I couldn't have my son in there; I
11    couldn't -- couldn't do anything else with it.
12    It was for that job.
13        Q.    Weren't you restricted from having your son
14    in there because of insurance requirements?
15        A.    I don't know.  I had my own insurance on
16    the truck, too.  It was FedEx corporation --
17    according to Peter Ricks, it was FedEx corporation's
18    reasons.
19            All my commercial trucking stuff I have on
20    myself, I have passengers listed under my trucking
21    association.  As far as I know, DOT has nothing
22    against having a son with you, if there's a seat belt
23    and it's a legal vehicle, and there's insurance to
24    cover a passenger in it.
25        Q.    Who told you that you couldn't use your
```

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 180

1    vehicle during the hours it wasn't needing to be

2    parked at the FedEx terminal?

3        A.    Peter did.

4        Q.    Did --

5        A.    I wanted to move one of my friends one

6    weekend, and he said:  No, that would be

7    unacceptable.

8        Q.    Did he tell you why?

9        A.    He said we didn't have anything to cover up

10   all the logos with, and he said it would not be

11   acceptable.

12       Q.    Did you make any attempt to get something

13   to cover up the logos?

14       A.    I asked him what I could do, and he said:

15   You have to do it by their standards.  And I said:

16   Well, can you give me their stuff?  And he says:

17   Well, I don't know.  And I said:  Well, what are you

18   telling me?  I says:  I can go and put a piece of

19   tape on there, a piece of duct tape on it.  And he

20   goes:  Well, no, that wouldn't be sufficient.

21       Q.    Is that the only time Mr. Ricks told you

22   you couldn't use the vehicle for personal purposes?

23       A.    I believe that was the only time I had

24   asked, because I needed to help friends move.

25       Q.    Do the DOT regulations restrict you having

WILLIAMS v. FEDEX

1    a passenger in, when you're driving for FedEx?

2        A.    I don't know if FedEx's laws are that way

3    or not.

4              I know my trucking company is not that way.

5    I can have passengers in there, from my insurance

6    company.

7        Q.    Were you required to get written

8    authorization from FedEx Ground before you had a

9    passenger in your vehicle?

10        A.    I don't know why I would have to.

11        Q.    Are you familiar with the DOT requirements

12    on that issue?

13        A.    DOT versus FedEx?  No, I don't know how DOT

14    and FedEx.  I know DOT Transportation, I know the

15    inspections and everything, have a -- I've talked to

16    them, and they say there's nothing against it.  Other

17    than that, no, I don't know.

18        Q.    So you are not familiar with the DOT regs?

19        A.    According to FedEx, no.  DOT reg.  I've

20    been inspected with my son in the truck, and there

21    was nothing they wrote me up for.

22        Q.    Did you have permission to have your son in

23    the truck?

24        A.    It was my truck; I should have had

25    permission, since I owned it and I have insurance on

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

Page 222

1    there was, but I never noticed the difference.
2        Q.    Do you think that FedEx received a benefit
3    from those trips you took to Girdwood to deliver
4    packages?
5        A.    Somebody got paid for them being delivered.
6        Q.    And when you did the sorting in the Kenai
7    terminal, do you think that that was a benefit to
8    John Thompson or to FedEx?
9        A.    That was a benefit to the guy that works
10   down in Kenai, as it made his job easier.  I think
11   that -- I don't remember that guy's name anymore.
12   But I'm sure it made his job lots easier, beings he
13   didn't have to sort out that.  But I don't remember
14   his name.
15       Q.    Did he work for FedEx, or was he an
16   independent contractor?
17            MS. BRADLEY:  Objection as to form.
18            THE WITNESS:  I think he was a
19   subcontractor, too, but he delivered door to door, or
20   whatever you call it.
21   BY MR. ZOREA:
22       Q.    You testified that Peter told you that all
23   the paperwork concerning how you would be paid would
24   be on file, and that you could review that; is that
25   correct?

WILLIAMS v. FEDEX

Page 223

1    A.    No.   I don't think he told me, in the

2  beginning.   I think later I had asked, and -- and --

3  I don't remember if it was Peter that told me.   I

4  believe it was Nicole that told me that there were

5  statements that came in that showed what all routes

6  were paid, what all -- however many packages were

7  delivered per -- different things that John had

8  going, so you could figure out what -- what the

9  shuttle was.   The shuttle was under something

10  different.   But I think the other stuff was under

11  different stuff.   I never got a complete real

12  accounting of any of that, to really look at it.   All

13  I got was part of the shuttle -- it was the

14  "settlement," I guess is what they call it.   And

15  that's the only thing that I really got a look at.

16    Q.    Exhibit 11.   Exhibit 11 is the Alcohol and

17  Drug Test Verification form; is that correct?

18    A.    Did I do the right one?   It says 11.   Is

19  that what you got?

20    Q.    Yeah.

21    A.    Oh, yeah.   The Alcohol and Drug

22  Verification.   Yeah.

23    Q.    At the bottom -- or mid part, where it

24  says that -- mid part says, Name of person providing

25  information, and next to that it says, John T.

WILLIAMS v. FEDEX

JOE WILLIAMS
4/3/2006

235

1               CERTIFICATE OF REPORTER

2

3          I, GAIL RUTH PECKHAM, RPR, Registered

4     Professional Reporter, hereby certify:

5               That I am a court reporter for Pacific Rim

6     Reporting and Notary Public for the State of Alaska;

7     that the foregoing proceedings were taken by me in

8     Stenotype Shorthand and thereafter transcribed by me;

9     that the transcript constitutes a full, true and

10    correct record of said proceedings taken on the date

11    and time indicated therein.

12              Further, that I am a disinterested person

13    to said action.

14              IN WITNESS WHEREOF, I have hereunto

15    subscribed my hand and affixed my official seal this

16    _____ day of _____, 2006.

17

18

19                        _____

20                        GAIL RUTH PECKHAM, RPR,

                          and Notary Public for the

21                        State of Alaska

22

23

24                        My commission expires:  3-26-10

25

PACIFIC RIM REPORTING   907-272-4383
www.courtreportersalaska.com