IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOE W. WILLIAMS,<br><br>            Plaintiff,<br><br>     vs.<br><br>FEDEX GROUND PACKAGE SYSTEMS, INC., an Alaskan corporation,<br><br>            Defendants. | Case No. 3:05-cv-192   TMB<br><br>**O R D E R**<br>**Re: Motion for Summary Judgment** |

## I.  MOTION PRESENTED

Defendant has moved for Summary Judgment.[1]  Plaintiff has opposed the motion,[2] and Defendant has Replied.[3]  Supplemental authorities have been filed by both parties.[4]  Oral argument has not been requested.   The Court being fully advised, now enters this Order.

## II.  BACKGROUND

In January 2002, Plaintiff Joe Williams met with John Thompson and Peter Ricks, Senior Manager of FedEx Ground, ("FEG"), regarding a business opportunity.  The three discussed working a shuttle van route for FEG to move packages between Anchorage and a location in the Kenai/Soldotna area of Alaska.

According to Plaintiff, Ricks explained the specific requirements for the shuttle run job, and described it as a great opportunity, with a great company, and that it would present a weekly,

---

[1] Docket 25.

[2] Docket 39.

[3] Docket 44.

[4] Docket now. 48, 49 & 54.

1

year round job. As Williams understood the agreement between Peter Ricks, John Thompson, and himself, he would be required to purchase a van for the shuttle run, but would receive all revenue from the van, other than a $100.00 administrative fee to John Thompson.

Defendant's position is that Thompson was an independent contractor for FEG, and that Thompson had contracted to fulfil the Anchorage to Kenai shuttle run.  Thompson was allowed to retain drivers to assist him in fulfilling his contractual obligations, and to supervise and pay the drivers he retained.  FEG's position is that Plaintiff was therefore not an employee of FEG, but rather a subcontractor of Thompson.  Nevertheless, Plaintiff maintains that Ricks assured him that he (Ricks) was the ultimate person in control of the FEG shuttle run, and that as long as his job was done properly, the job with FEG would continue for at least three years.

Based upon the assurances allegedly provided to him by Ricks, Williams decided to purchase a vehicle to use for driving the FEG shuttle route. The vehicle Williams purchased cost $36,371.00, and was purchased only after approval by Peter Ricks.  Prior to purchasing his vehicle, Williams consulted frequently with Ricks concerning what sort of vehicle would comply with the job requirements for the shuttle run.  Plaintiff states that Peter Ricks even confirmed Williams' employment with the auto dealership, to help secure the vehicle loan.  FEG describes Ricks' involvement with the van purchase as a necessity to make sure the vehicle met certain vehicle requirements specified in Thompson's Agreement with FEG.  If Plaintiff desired to use his vehicle for personal use, FEG required that he cover the business logos from general view.

Before his new vehicle was ready, Plaintiff rented a van from FEG to perform the shuttle route.  Prior to being permitted to operate the rented shuttle van to perform the FEG route, Ricks told Williams that he would have to fill out an application to work for Pomerantz Staffing Services, LLC (Pomerantz), a staffing agency. From February 8, 2002, until around March 4, 2002, he was told by Ricks that he was a temporary employee to FEG from Pomerantz.  During the February to March 2002 period, Plaintiff says Peter Ricks was his direct supervisor, and John Thompson did not provide Williams any input concerning his day-to-day activities for FEG.  Defendant's position is that Thompson was "stretched to the limit" in managing his other work areas, and therefore

Thompson directed Plaintiff to work directly with Ricks in operating the shuttle run, despite Plaintiff's status as a subcontractor.

About March 8, 2002, Williams began to use his own vehicle to perform the shuttle run from Anchorage to Kenai/Soldotna. While operating his own vehicle, FEG identified him as a subcontractor for John Thompson, rather than a temporary employee for Pomerantz, although the specifics of his job duties did not significantly alter. During the time that he operated his own vehicle to perform the shuttle run, he was paid from John Thompson on checks printed in the name of "Thompson & Associates, FedEx Ground." If he had any questions with his payments, Plaintiff says he would go to Peter Ricks, instead of John Thompson because Ricks consistently claimed that he was the overall man in control of FEG operations. In addition to delivering FEG packages from Anchorage to the Kenai/Soldotna area, Williams also had many preliminary tasks to perform. Plaintiff says the preliminary tasks he performed were performed at the direct request of Peter Ricks, with no input or direction given from John Thompson.[5]

During all times that Plaintiff performed his tasks for FEG, he says FEG placed restrictions on his day-to-day activities. For example, FEG required Williams to wear an FEG uniform, and that his vehicle display FEG logos. Additionally, Ricks told Williams that he could have no personal decorations on his vehicle. On one occasion, Ricks removed a magnetic American flag from Williams' vehicle, stating that the flag violated FEG regulations, and could not remain on the vehicle.

FEG exercised other significant controls over Williams' conduct, both on the job and off the job. During all times that he performed his tasks for FEG Williams was prohibited, on direct orders

---

[5]The tasks included: (1) delivering FEG packages to the United States Postal Service (USPS), including transporting FEG payment checks to the USPS at the personal direction of Peter Ricks; (2) dropping off, and picking up, FEG packages to Northern Air Cargo; (3) dropping off, and picking up, FEG packages to Alaska Central Express; (4) off-loading any packages from Northern Air Cargo or Alaska Central Express from his vehicle to FedEx's premises; (5) conducting residential deliveries of FEG packages to Girdwood, Alaska locations; (6) off-loading and sorting packages at the Kenai/Soldotna drop-off location, and (7) loading the packages in Kenai/Soldotna for final transport back to Anchorage, Alaska.

from Peter Ricks, from having his son accompany him during his shuttle run from Anchorage to Kenai/Soldotna.  Peter Ricks stated that Williams would violate FEG policies if he had additional passengers in his vehicle.  On another occasion, Williams was at a tire shop, attempting to change tires on his truck. He was not wearing his FEG uniform, and it was his day off. Williams had an altercation with the sales person at the tire shop. The next day when he arrived at work, Ricks told Williams that he had received a complaint. As a result Ricks told William he had to watch FEG videos related to customer care, or else he would be fined for his conduct. During all times that he performed his tasks for FEG, Williams was required to fill out paperwork for FEG showing his hours of work. Williams also was required to drop off relevant paperwork from Northern Air Cargo, and Alaska Central Express, all of which were dropped off at FEG's main office.  Williams was not required to submit any copies of paperwork to John Thompson during this time period.

      In early October 2002, John Thompson told Williams that he could no longer work the FEG shuttle route. Williams complained to Peter Ricks concerning John Thompson's decision. Plaintiff alleges that Ricks assured Williams that he would honor their initial agreement.  Despite his assurances, Williams was no longer allowed to perform the shuttle run for FEG after October 15, 2002.  FEG's position is that Thompson decided to terminate Plaintiff's contract and operate the shuttle run himself, without any direction or involvement from FEG.

      During all times that he performed tasks for FEG, Williams alleges that he worked an average of 10 hours per day, five days per week.. At no time was he paid overtime compensation for the hours he worked. Williams received payment per package delivered, which amounted to an average of $1,100.00 per week. From his gross earnings, however, he paid an average of $750.00 in expenses (counting those expenses incurred after being terminated), none of which have been reimbursed by FEG or John Thompson. Williams' net earnings from the tasks he performed for FEG between February 11, 2002 to October 14, 2002 amounted to $350.00 per week. Williams still had the vehicle payments associated with the truck, and continued making the payments on the vehicle for nearly a year after being terminated.

4

Plaintiff filed a Complaint in the District Court for the State of Alaska, Third Judicial District at Anchorage, against John Thompson and FEG, alleging four causes of action: Violation of Covenant of Good Faith and Fair Dealing, Violation of Alaska's Wage and Hour Act, Quantum Meruit/Quasi-Contract, Violations of AS § 45.50.471. Plaintiff later settled with John Thompson, and proceeded against FEG as the only remaining defendant. FEG then removed the matter to Federal Court.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[6] The moving party bears the initial burden of proof for showing that no fact is in dispute.[7] If the moving party meets that burden, then it falls upon the non-moving party to refute with facts which would indicate a genuine issue of fact for trial.[8] Summary judgment is appropriate if the facts and allegations presented by a party are merely colorable, or are not significantly probative.[9]

### IV.  DISCUSSION

Defendant seeks summary judgment on all of the claims in Plaintiff's Complaint.

**Overtime Compensation under the Alaska Wage and Hour Act**

Defendant argues that Plaintiff is not entitled to overtime compensation for two reasons: 1) the claim is largely barred by the two-year statute of limitations found in AS 23.10.130, and 2) FEG was not Plaintiff's employer, because Plaintiff was a subcontractor to an independent contractor.

---

[6] Fed. R. Civ. P. 56(c).

[7] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[9] *Id. See also, In re Lewis*, 97 F.3d 1182, 1187 (9th Cir. 1996); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1995).

### *- Statute of Limitations*

Alaska's Wage and Hour Act provides a two-year statute of limitations.[10] Plaintiff filed suit on October 1, 2004, so FEG argues that he is barred from recovering overtime compensation for any hours worked before October 1, 2002.

Plaintiff argues that the statute of limitations is not a bar to the overtime claims, because a genuine issue of material fact exists concerning the final date of his employment. While Defendant says Plaintiff's last day of driving was October 4, 2002, Plaintiff argues that the date was October 14, 2002.

While there may be a dispute regarding Plaintiff's last day of work as a FEG driver, there is no dispute that the statute of limitations found in AS 23.10.130 would bar any claim for overtime incurred prior to October 1, 2002.

### *- Employer/Employee Relationship*

FEG argues that the Alaska Wage and Hour Act is inapplicable because it was not Plaintiff's employer. Rather, Plaintiff was a subcontractor of an independent contractor for FEG. FEG explains that it relies on the use of "Pick-Up and Delivery Contractors," ("P&D"), instead of employees, to delivery packages, and that the Operating Agreement that P&D Contractors enter into with FEG explicitly states that any subcontractors the P&D may employ "shall not be considered employees" of FEG.

In response, Plaintiff argues that there is a genuine fact dispute regarding whether or not Plaintiff and Defendant had an employer/employee relationship. "The undisputed facts of this case create a triable issue concerning whether FEG and John Thompson created a joint employer relationship toward Joe Williams."

---

[10]AS 23.10.130.

The Alaska Wage and Hour Act provides that the definitions of the Fair Labor Standards Act of 1938[11] ("FLSA") are incorporated therein.[12] The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee."[13] The Ninth Circuit has held that the definition of "employer" under the FLSA "is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes."

> (a) A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938, since there is nothing in the act which prevents an individual employed by one employer from also entering into an employment relationship with a different employer. A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case. If all the relevant facts establish that two or more employers are acting entirely independently of each other and are completely disassociated with respect to the employment of a particular employee, who during the same workweek performs work for more than one employer, each employer may disregard all work performed by the employee for the other employer (or employers) in determining his own responsibilities under the Act.
>
> On the other hand, if the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act, including the overtime provisions, with respect to the entire employment for the particular workweek. In discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments made to the employee by the other joint employer or employers.
>
> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the

---

[11] 29 U.S.C. §§ 201-219.

[12] AS § 23.10.145.

[13] 29 U.S.C. § 203.

employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.[14]

"The common law concepts of 'employee' and 'independent contractor' are not conclusive determinants of the FLSA's coverage."[15] A number of factors are useful in distinguishing employees from independent contractors for purposes of legislation such as the FLSA, though no individual factor is dispositive of whether an employee/employer relationship exists.[16] The factors include:

  1) the degree of the alleged employer's right to control the manner in which the work is to be performed;

  2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

  3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

  4) whether the service rendered requires a special skill;

  5) the degree of permanence of the working relationship; and

  6) whether the service rendered is an integral part of the alleged employer's business.[17]

Contractual language between the parties, or subjective intent of the parties, is not conclusive. "Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."[18] Furthermore, "the independent contractor status of one party [Thompson] standing in the position of an employer of certain workers does not as a matter of law

---

[14] 29 C.F.R. § 791.2.

[15] *Real v. Driscoll Strawberry Assocs., Inc.*, 603 F.2d 748, 754 (9th Cir. 1979).

[16] *Id.*

[17] *Id.* at 754.

[18] *Id.* at 755.

negate the possibility that the contractee [FEG] may be a joint employer of those workers under the FLSA."[19]

The determination of whether an entity is a "joint employer" under the FLSA is a question of law.[20]  "[W]hether an employment relationship exists depends on the economic reality of the employment situation."[21]  The test to determine economic reality looks to four factors:

Whether the alleged employer:

(1) had the power to hire and fire employees;

(2) supervised and controlled employee work schedules or conditions of employment;

(3) determined the rate and method of payment, and

(4) maintained employment records.[22]

However this is not a "mechanical determination" and should not be "blindly applied."[23]  The four *Bonnette* factors are a "framework for analysis," but "[t]he ultimate determination must be based 'upon the circumstances of the whole activity.'"[24]  "Where an individual exercises 'control over the nature and structure of the employment relationship,' or 'economic control' over the relationship, that individual is an employer within the meaning of the [FLSA], and is subject to liability."[25]

---

[19] *Id.* at 756.

[20] *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1469 (9th Cir. 1983) (disapproved of on other grounds, *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985)).

[21] *Hale v. State of Arizona,* 967 F.2d 1356, 1364 (9th Cir. 1992).

[22] *Id.; Bonnette*, 704 F.2d at 1470.

[23] *Id.*

[24] *Id.* (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (U.S. 1947)).

[25] *Lambert v. Ackerley*, 180 F.3d 997, 1011-1012 (9th Cir. 1999) (quoting *Bonnette*, 704 F.2d at 1470).

There are eight secondary factors identified by the Ninth Circuit, which may be used in addition to *Bonnette*, to determine whether a joint employer relationship exists:

(1) whether the work done by the employee was analogous to a "specialty job on the production line";

(2) whether the responsibility under the contract was standard for the industry and could be passed from one contractor to another without "material change" and little negotiation;

(3) whether the purported joint employer owns or has an interest in the "premises and equipment" used for the work;

(4) whether the employees had a "business organization that could [] shift as a unit from one worksite to another;"

(5) whether the services rendered were "piecework" and did not require special "skill, initiative or foresight";

(6) whether the employee had "an opportunity for profit or loss" depending upon the employee's managerial skill;

(7) whether there was "permanence in the working relationship;" and

(8) "whether the service rendered [was] an integral part of the alleged [joint] employer's business."[26]

*Torres-Lopez v. May* involved the Migrant and Seasonal Agricultural Worker Protection Act (AWPA). Migrant farm works brought action against a cucumber grower for violating the FLSA and the AWPA. The grower, Bear Creek Farms, argued that it was not an "employer" of the migrant workers, but rather that they had contracted with a farm labor contractor to supply and supervise farm workers to harvest Bear Creek Farms' cucumber crop. In exchange, Bear Creek Farms agreed to pay the farm labor contractor fifty percent of the gross proceeds from the sale of the cucumber

---

[26]*Torres-Lopez v. May,* 111 F.3d 633, 640 (9th Cir. 1997).

10

crop to the cannery.[27] Applying the eight factors above, the Court concluded that Bear Creek Farms was a joint employer of the migrant workers.[28] The Ninth Circuit has acknowledged that the *Torres-Lopez* factors are applicable "to circumstances in which a company has contracted for workers who are directly employed by an intermediary company."[29] The Ninth Circuit subsequently applied the *Torres-Lopez* factors in a case involving Air France and its ground handling service companies, thus clearly extending the factors to cases beyond the AWPA.[30] *Chao* acknowledges that "our case law contains more examples of such 'vertical' joint employment than examples of 'horizontal' joint employment . . . ."[31] The case presently before this Court potentially involves such a "vertical joint employment" situation.

Plaintiff presents several disputed material facts, the resolution of which is necessary in order to accurately apply the *Bonnette* or *Torres-Lopez* factors. Specifically:

- Whether FEG (through Peter Ricks) entered into an oral contract with Plaintiff;

- Whether FEG retained control of the FEG shuttle run;

- Whether Ricks offered Plaintiff assurances that he would keep Plaintiff employed for a minimum period of time;

- Whether Ricks exercised direct authority over Plaintiff (Plaintiff alleges that Ricks removed a flag from his vehicle and disciplined him for using foul language during his day off);

- Whether FEG controlled Plaintiff's work schedule;

- To what extent FEG maintained employment records regarding Plaintiff;

---

[27]*Id.* at 637.

[28]*Id.* at 643-44.

[29]*Chao v. A-One Medical Services,* 346 F.3d 908, 917 (9th Cir. 2003).

[30]*See Moreau v. Air France*, 356 F.3d 942 (9th Cir. 2004).

[31]*Chao*, 346 F.3d at 917.

11

- Whether Plaintiff's use of the FEG facilities was more than "minimal"; and

- Whether Plaintiff had the opportunity for profit or loss depending on his managerial skills.

> In *Anderson v. Liberty Lobby, Inc*., . . . the Supreme Court explained that "the inquiry performed [at summary judgment] is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." The Court explained, however, that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."[32]

Defendant has filed copies of two district court opinions from other jurisdictions in support of its argument that FEG drivers are not "employees."[33] Neither case involved a joint employment analysis in the FLSA context.

Because there are genuine issues of material fact, summary judgment on the issue of the alleged employer/employee relationship is inappropriate at this juncture.

**Quantum Meruit/ Quasi-Contract**

Plaintiff presents quantum meruit and quasi-contract claims as alternative theories of relief. "Quantum meruit (or quasi-contract) is an equitable remedy implied by the law under which a plaintiff who has rendered services benefitting the defendant may recover the reasonable value of those services when necessary to prevent unjust enrichment of the defendant. . . .   Quantum meruit is based not on the intention of the parties, but rather on the provision and receipt of benefits and the injustice that would result to the party providing those benefits absent compensation.*"[34]*

---

[32]*Leslie v. Grupo ICA*,198 F.3d 1152, 1157 (9th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 255 (1986)).

[33]Docket 48 and Docket 54.

[34]*In re De Laurentiis Entertainment Group Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992) (discussing California law).

Despite FEG's argument that quantum meruit and quasi-contract are two distinct and mutually exclusive concepts, Alaska law treats claims of unjust enrichment, quasi-contract and quantum meruit claims similarly.[35] The elements of these claims are: (1) a benefit conferred to defendant; (2) appreciation by defendant of that benefit; and (3) inequity of allowing defendant to retain the benefit without paying value therefor.[36]

Defendant argues that no actual or constructive contract exists as a matter of law, and that therefore FEG is entitled to summary judgment on these issues. Specifically, FEG argues that Plaintiff cannot establish an *actual* contract with FEG because there was no meeting of the minds. Furthermore, FEG argues that there was no *constructive* contract between the parties, because Plaintiff cannot show that FEG received a benefit from the arrangement that amounted to "unjust enrichment."

In response, Plaintiff alleges that there was a meeting of the minds between he and Ricks, as evidenced by the purchase of a $32,000 vehicle. Plaintiff says the only reason that he purchased his delivery van was because Ricks made adequate assurances to him that he would have a job for at least three years. With respect to the issue of unjust enrichment, Williams asserts that the net return for his services amounts to $346.84 a week for 50 hours of work.

The Court concludes that there is a genuine issue of material fact as to whether FEG was unjustly enriched by Plaintiff's labors. Accordingly, summary judgment is not appropriate.

**Implied Covenant of Good Faith and Fair Dealing**

FEG argues that Plaintiff's implied covenant of good faith and fair dealing theory fails as a matter of law, because there is no implied covenant in quasi-contracts.

In response, Plaintiff notes that he has specifically asserted that he had an oral contract with FEG concerning driving for three years, and that this oral contract supports a claim of breach of the

---

[35] *Alaska Sales & Service, Inc. v. Millet*, 735 P.2d 743, 746 n. 6 (Alaska 1987).

[36] *Reeves v. Alyeska Pipeline Serv. Co.*, 926 P.2d 1130, 1143 (Alaska 1996).

covenant of good faith and fair dealing, because the covenant of good faith exists in every Alaskan contract. Plaintiff is correct.[37]

The Alaska Supreme Court has explained:

> The covenant can be breached objectively or subjectively. The objective prong of the covenant is breached when an employer fails to act in a manner that a reasonable person would consider fair, which includes treating similarly situated employees disparately, terminating employees on unconstitutional grounds, and terminating employees in violation of public policy. The subjective prong of the covenant is breached when an employer is motivated by the goal of depriving the employee of a benefit of the contract. The purpose of the covenant is to effectuate the reasonable expectations of the parties, not to alter or to add terms to the contract.[38]

Williams argues that "[a] fact issue exists concerning whether or not Ricks knew that he could not guarantee Williams three years of work. Further, a fact issue exists concerning whether or not FEG could have fulfill its promise that Williams would have three years of work."

Having previously concluded that there is a genuine issue of material fact as to whether Ricks entered into an oral contract with Plaintiff, it would be inappropriate now to grant summary judgment on the theory of breach of the implied covenant. Whether or not there was a breach cannot be determined until it is determined whether there was a contract at all.

**Unfair Trade Practices Act**

Plaintiff alleges that FEG violated Alaska's Unfair Trade Practice Act, which makes it unlawful to "represent[] that an agreement confers or involves rights, remedies or obligations which it does not confer or involve, or which are prohibited by law."[39] FEG argues that it did not violate this section because 1) it had no agreement with Plaintiff; and 2) it made no misrepresentations

---

[37] *See Mitford v. de Lasala,* 666 P.2d 1000, 1006 (Alaska 1983) (finding an implied covenant of good faith and fair dealing in *every* contract).

[38] *Miller v. Safeway, Inc.*, — P.3d —, 2007 WL 3227574 (Alaska 2007).

[39] AS 45.50.471(b)(14).

regarding its relationship with Plaintiff. FEG characterizes the alleged agreement between it and Plaintiff as preliminary negotiations or "an unenforceable 'agreement to agree.'"[40]

Plaintiff argues that "[b]eing duped into purchasing a vehicle, and then being told later that he had no guarantees of work is unfair and deceptive." As with the implied covenant of good faith and fair dealing, a violation of the Unfair Trade Practices act cannot be determined until it is determined that a contract existed.

**Punitive Damages**

Defendant argues that punitive damages are not available, as a matter of law, under the theories of breach of implied covenant of good faith and fair dealing, quantum meruit, or quasi-contract. Plaintiff has not responded to this argument.

Alaska follows "the Restatement's position that '[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable.'"[41] The Alaska Supreme Court has specifically held that punitive damages are not recoverable for breach of the implied covenant of good faith and fair dealing.[42] Accordingly, Plaintiff's claim for punitive damages is dismissed.

## V. CONCLUSION

In light of the foregoing, Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART.

The statute of limitations found in AS 23.10.130 bars any claim for overtime incurred prior to October 1, 2002. Furthermore, Summary Judgment is granted on the issue of punitive damages. Punitive damages are not available in this contract action, and Plaintiff's claim for punitive damages

---

[40] Docket 44 at 22.

[41] *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660, 671 (Alaska 2002) (citing Restatement (Second) of Contracts § 355 (1979); *Wien Air Alaska v. Bubbel*, 723 P.2d 627, 631 (Alaska 1986)).

[42] *ARCO Alaska, Inc. v. Akers*, 753 P.2d 1150, 1154 (Alaska 1988).

is dismissed with prejudice.   The remainder of Defendant's Motion for Summary Judgment is denied.

       It is so ordered.

       Dated at Anchorage, Alaska, this 7th day of December, 2007.


                                                        /s/ Timothy Burgess

                                                        Timothy M. Burgess
                                                        United States District Judge